2020 IL App (1st) 181216

No. 1-18-1216

Opinion filed December 21, 2020

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 17955 |
| | ) | |
| EDWARD BLOXTON, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Walker concurred in the judgment and opinion
Justice Pierce dissented, with opinion

**OPINION**

¶ 1     Police arrested Edward Bloxton for possessing a firearm, although they had no idea if he possessed it legally. Police then learned of Bloxton's criminal record and charged him with multiple counts of possessing a firearm by a felon and possession of a defaced firearm. After denying Bloxton's motion to quash and suppress evidence, the trial court found Bloxton guilty and sentenced him to five years' imprisonment.

¶ 2     Bloxton contends his attorney failed to argue his possession alone did not give the police probable cause to arrest. He asserts that, had the arrest been quashed, evidence the police obtained,

namely the gun and his criminal record, would have been suppressed and the State could not have proven him guilty. We agree. In light of *People v. Aguilar*, 2013 IL 112116, Bloxton's attorney should have argued that the police did not have probable cause to arrest when they did not know whether he possessed it legally. Bloxton was prejudiced by his attorney's failure to make that argument, as the motion to suppress evidence likely would have been successful and the evidence relied on to convict him would have been suppressed. We reverse.

¶ 3                                        Background

¶ 4      The State proceeded on one count of unlawful possession of a weapon by a felon and possession of a weapon with a defaced serial number. Before trial, Bloxton's counsel filed a motion to suppress evidence, arguing the police obtained the weapon through an unlawful search and seizure because (i) Bloxton was neither involved nor believed to have been involved in the commission of a crime at the time of his arrest and (ii) the police had no reasonable suspicion that he was armed or dangerous. Bloxton waived a jury trial, and the trial judge held the hearing simultaneously with his bench trial.

¶ 5      On the evening of November 24, 2017, Chicago police officers Caulfield, Spacek, and Byrne were on routine patrol in the 6000 block of South Hermitage Avenue, a residential neighborhood consisting of single-family homes and two-flat apartment buildings. While driving westbound on 61st Street, the officers saw a group of about 10 people standing in the street in the 6000 block of Hermitage. The officers saw some people drinking out of clear plastic cups. They stopped to investigate whether alcohol was being consumed on a public way. The officers wore plain clothes and black bullet-proof vests, with stars and nametags on the outer cover and "police" on the back.

¶ 6    The officers approached the group and asked them what they were drinking. Bloxton was not holding a cup. Caulfield made eye contact with Bloxton, who then began walking toward a house at 6016 South Hermitage. Caulfield saw a large bulge in Bloxton's front right pants pocket. Caulfield did not know what caused the bulge, but testified that he thought it might be a firearm. Caulfield identified himself as a police officer and told Bloxton to stop multiple times. Bloxton continued walking toward the house. Bloxton entered the front yard and attempted to close the gate behind him. Caulfield, directly behind Bloxton, followed up the steps and onto the porch. According to Caulfield, Bloxton then reached into his pocket, exposing the handle of a gun, and attempted to pull it from his pants. Caulfield grabbed Bloxton's right hand and shoved the hand and the gun into the pocket. Caulfield called for assistance. Officer Spacek responded and placed handcuffs on Bloxton. Caulfield then took the gun from Bloxton's pocket. Caulfield noticed the serial number had been filed off.

¶ 7    On cross-examination, Caulfield acknowledged that, aside from seeing some people in the group drinking out of plastic cups that might have contained alcohol, he witnessed no one engaging in possible criminal activity. Caulfield had never seen Bloxton before that night and never saw him do anything illegal. He had not checked if Bloxton had a criminal record or determined Bloxton's status to legally possess a firearm. And there were no warrants for Bloxton. Further, Caulfield said the bulge in Bloxton's pocket appeared to be a gun, but he did not know what it was.

¶ 8    At the police station, after reading Bloxton his Miranda warnings, Caulfield asked him about the gun. Caulfield said Bloxton told him he bought it for $250 earlier that night because he knew the neighborhood was bad and that "the youngins have been shooting everybody up." The

interview was documented in the police report but it was not recorded, and Bloxton did not sign a handwritten statement.

¶ 9 Neither Officer Byrne nor Bloxton testified. The parties stipulated that Bloxton had a conviction for aggravated kidnapping. After denying Bloxton's motion for a directed finding and before hearing closing arguments, the trial court heard arguments on the motion to quash arrest and suppress evidence. Bloxton's counsel argued the police lacked probable cause to arrest Bloxton based on his refusal to heed Caulfield's order to stop. Counsel also disputed that the gun was in plain view, questioning whether Bloxton would pull out a gun knowing he was being followed by an officer. The trial court denied the motion, finding that Bloxton was not seized until he took the gun out of his pocket, and that the weapon was in plain view for Caulfield to observe, giving the officers probable cause to arrest Bloxton.

¶ 10 After closing arguments, the trial judge found Bloxton guilty of unlawful use of a weapon by a felon and possession of a weapon with a defaced serial number and sentenced him to five years' imprisonment.

¶ 11 Analysis

¶ 12 Bloxton argues his trial counsel was ineffective for failing to argue during the motion to quash arrest and suppress evidence that the police lacked probable cause to arrest him based solely on his possession of a firearm when they did not know at the time whether he was legally permitted to carry it.

¶ 13 *Strickland* Standard

¶ 14 We evaluate claims of ineffective assistance of counsel under the two-prong test first announced in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Henderson*, 2013 IL

114040, ¶ 11. To satisfy *Strickland*, a defendant must show (i) counsel's performance was deficient and (ii) the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. The prejudice prong requires defendant show that counsel's errors were so serious as to deprive him or her of a fair trial, a trial whose result is reliable. *Id.* In assessing the first *Strickland* prong, we show great deference to counsel's strategic decisions, making every effort " 'to eliminate the distorting effects of hindsight *** and to evaluate the conduct from counsel's perspective at the time.' " *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 23 (quoting *Strickland*, 466 U.S. at 689).

¶ 15    We review claims of ineffective assistance of counsel *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 16    Bloxton argues his attorney provided ineffective of assistance by failing to argue that the police officers did not have probable cause to arrest him based solely on his possessing a firearm. Bloxton argues that under *Aguilar*, 2013 IL 112116, mere possession no longer constitutes a crime, and the officers were unaware of his criminal record that made his possession illegal. Relying on *People v. Fernandez*, 162 Ill. App. 3d 981 (1987), Bloxton contends his attorney's misapprehension of the law cannot be considered trial strategy and led to her failing to seek to quash and suppress. Bloxton asserts this argument would have succeeded, and her failure to raise it constituted ineffective assistance.

¶ 17                                    Probable Cause

¶ 18    An arrest made without probable cause violates the United States and Illinois Constitutions' prohibitions against unreasonable searches and seizures. *People v. Lee*, 214 Ill. 2d 476, 484 (2005). The police's determination of probable cause focuses on the facts known to the police at the time of the arrest. *Id.* "A warrantless arrest cannot be justified by what is found during

a subsequent search incident to the arrest." *Id.* We apply an objective analysis and do not consider a police officer's subjective belief as to the existence of probable cause. *Id.*

¶ 19    In *Aguilar*, the Illinois Supreme Court held that the provisions of the unlawful use of a weapon statute that prohibited public possession of a gun were facially unconstitutional under the second amendment to the United States Constitution. *Aguilar*, 2013 IL 112116, ¶¶ 15-21. Because those provisions imposed a blanket ban on an individual's right to possess a gun for self-defense outside of the home, they contradicted the essence of the second amendment right to bear arms. *Id.* Thus, post-*Aguilar*, the possible observation of a handgun is not in itself, without any other evidence of a crime, sufficient to provide an officer with probable cause for arrest. See *id.* ¶ 20.

¶ 20    Police had no probable cause based on the facts known at the time of Bloxton's arrest. The evidence showed that the officers were on patrol when they saw a group of people in the street who might have been drinking alcohol from plastic cups. The officers acknowledged Bloxton did not have a cup and, thus, could not have been suspected of drinking alcohol in a public way. Nor did they see him engaging in any criminal activity whatsoever. Caulfield acknowledged he did not know whether Bloxton could legally possess a gun because he had not checked Bloxton's criminal history and did not know whether he had a valid Firearm Owners Identification (FOID) card.

¶ 21    After making eye contact with Bloxton, Caulfield saw what he thought was a gun in Bloxton's pocket, though he testified he did now know what it was. Bloxton began to walk away and toward the house. Caulfield told Bloxton to stop but testified that Bloxton was free to leave, and indeed, Bloxton continued to walk to the front porch. Bloxton's walking away did not create probable cause, as this court has consistently held it is not sufficient to establish even the reasonable suspicion necessary to effectuate an investigatory stop under *Terry v. Ohio*, 392 U.S. 1

(1968), absent other circumstances indicating illegal behavior. See, *e.g.*, *In re D.L.*, 2018 IL App (1st) 171764, ¶ 29 (no reasonable suspicion where, "aside from [respondent's] flight, there was no testimony showing that respondent was acting suspiciously in any way"); *People v. Harris*, 2011 IL App (1st) 103382, ¶ 15 (evidence of flight, "[g]iven the dearth of contextual evidence" suggesting any other criminal activity, was insufficient to justify *Terry* stop). So where flight alone is insufficient to meet even this lower standard necessary for the *Terry* investigatory stop, it plainly would be insufficient to establish probable cause to arrest, particularly where, as here, defendant was walking toward a nearby house and not running from the police. See *In re D.W.*, 341 Ill. App. 3d 517, 526 (2003).

¶ 22    Accordingly, under these circumstances, the officers had no reason to believe that Bloxton was committing or had committed a crime. Moreover, his so-called "flight" cannot serve as the basis for Caulfield following him onto the porch and arresting him solely for possessing a gun, which no longer automatically amounts to criminal conduct. See *Aguilar*, 2013 IL 112116; see also *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 40 (noting, "police cannot simply assume a person who possesses a firearm outside the home is involved in criminal activity").

¶ 23    The dissent asserts that the officers engaged in a *Terry* stop and concludes that the facts "clearly showed" it was justified. *Infra* ¶ 37. But, the State does not contend the officers were making a *Terry* stop. Thus, the contention that *Terry* warranted the officers' actions is without merit.

¶ 24    The dissent also asserts that the "the totality of the circumstances suggested criminal activity." *Infra* ¶ 49. The circumstances the dissent relies on, however, either were not present or were not known at the time of the arrest and cannot factor into a probable cause analysis. First, the

dissent contends this is not a "[m]ere gun possession" case because the gun had been defaced, which is a crime. *Infra* ¶ 49. But the officers did not know the gun was defaced until *after* they seized Bloxton. The police officer's probable cause determination focuses on the facts known at the time of the arrest, not facts learned afterward. *Lee*, 214 Ill. 2d at 484. Further, contrary to the dissent's characterization that Bloxton "fled," the officers testified Bloxton walked toward a house, which, as noted, was an insufficient basis to stop him, much less arrest him. See *In re D.L.*, 2018 IL App (1st) 171764, ¶ 29 (no reasonable suspicion where, "aside from [respondent's] flight, there was no testimony showing that respondent was acting suspiciously in any way").

¶ 25    In short, the officers only knew that Bloxton possessed a gun, which no longer alone amounts to criminal conduct. See *Aguilar*, 2013 IL 112116. In the absence of evidence of criminal conduct, the police lacked probable cause to arrest.

¶ 26                    Ineffective Assistance of Counsel

¶ 27    Defense counsel's failure to argue during the pretrial motion that the police lacked probable cause based solely on Bloxton's possession of a gun was not strategic. Counsel recognized the need to challenge Bloxton's arrest, as she filed a motion to quash the arrest and suppress the evidence. But she focused on whether the gun was in plain view, rather than on the more pertinent issue: whether Bloxton's possession of a gun, without more, constituted probable cause for arrest. Counsel's failure was not strategic after *Aguilar*. No reasonable strategy would justify failing to assert the strongest argument for suppression. *People v. Little*, 322 Ill. App. 3d 607, 613 (2001) (prejudice can be found where motion to suppress would have been counsel's strongest and most likely wisest course of action). Counsel's failure to raise the strongest basis for quashing the arrest

and suppressing the evidence does not qualify as objectively reasonable. See *Henderson*, 2013 IL 114040, ¶ 11.

¶ 28    As noted, post-*Aguilar*, the officers' observation of a handgun is not in itself, without any other evidence of a crime, sufficient to provide an officer with probable cause for arrest. Further, had the motion been granted, the evidence obtained from the arrest—namely, the gun—would have been suppressed as "fruit of the poisonous tree." See *id.* ¶ 33.

¶ 29    Our supreme court in *Henderson* held that the "fruit of the poisonous tree" doctrine "is an outgrowth of the fourth amendment exclusionary rule." *Id.* "Under this doctrine, the fourth amendment violation is deemed the 'poisonous tree,' and any evidence obtained by exploiting that violation is subject to suppression as the 'fruit' of that poisonous tree." *Id.* The exclusionary rule applies not only to physical evidence but to "any 'fruits' of a constitutional violation—whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." *United States v. Crews*, 445 U.S. 463, 470 (1980). If a defendant establishes a causal connection between the primary illegality and the alleged fruits of the illegality, the State has the burden of demonstrating by clear and convincing evidence that the challenged evidence was obtained by means sufficiently distinguishable to be purged of the primary taint. *People v. Vought*, 174 Ill. App. 3d 563, 573 (1988).

¶ 30    As the State concedes, had the suppression motion been granted, the gun would have been excluded from evidence. Had the gun been excluded, Bloxton could not have been convicted of either unlawful possession of a weapon by a felon or possession of a weapon with a defaced serial

number. Thus, Bloxton was prejudiced by his attorney's failure to raise the proper argument. Further, the State would be unable to proceed without the suppressed evidence.

¶ 31     We reverse the conviction and vacate Bloxton's sentence. *People v. Smith*, 331 Ill. App. 3d 1049, 1056 (2002).

¶ 32     Reversed.

¶ 33     JUSTICE PIERCE, dissenting:

¶ 34     The majority in this case has reversed defendant's conviction outright on the basis that his attorney's failure to argue that the police lacked probable cause for the arrest as part of her motion to quash the arrest and suppress the evidence was ineffective because, had she done so, the evidence used in convicting him would have excluded. The majority rests its finding on its belief that the police lacked probable cause to arrest Bloxton because the evidence showed that Bloxton was not engaging in any criminal activity whatsoever. The majority posits that "post-*Aguilar*, the officers' observation of a handgun is not in itself, without any other evidence of a crime, sufficient to provide an officer with probable cause for arrest." *Supra* ¶ 28. I respectfully dissent.

¶ 35     Contrary to the majority's finding here, the record supports a finding that, based on his observations, Officer Caulfield reasonably believed that Bloxton was carrying a gun in his waistband and that he could make further inquiry. A *Terry* stop is a type of police-citizen encounter that allows for a brief investigative detention when supported by a reasonable, articulable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); 725 ILCS 5/107-14 (West 2010). "An officer may make an investigatory stop *** if he or she reasonably infers from the circumstances that an offense has been committed or is about to be committed." *People v. Henderson*, 266 Ill. App. 3d 882, 885 (1994). The question is whether the facts available to the officer warrant a person

of reasonable caution to believe that the action that the officer took was appropriate. *People v. Houlihan*, 167 Ill. App. 3d 638, 642 (1988). An evaluation of a *Terry* stop necessarily entails balancing the need for the seizure against the invasion that the seizure entails. *Terry*, 392 U.S. at 21.

¶ 36 I agree with the circuit court and the State that the totality of the circumstances supports a finding of reasonable suspicion. The trial court's conclusion, which is not against the manifest weight of the evidence, must be accepted. The record establishes that the officers were working in a high crime area, approached a group of men standing outside, and asked them what they were drinking. Bloxton was not holding a cup. Bloxton made eye contact with Officer Caulfield and then began walking toward a house at 6016 South Hermitage Avenue. Officer Caulfield saw a large bulge in Bloxton's front right pants pocket that Officer Caulfield believed to be a firearm. Bloxton had saggy pants on, with the waist around his butt. Officer Caulfield identified himself as a police officer and told Bloxton to stop multiple times. Bloxton continued walking toward the house, entered the front yard, and attempted to close the gate behind him. Officer Caulfield, who was directly behind Bloxton, followed him up the steps and onto the porch. Bloxton then reached into his pocket, exposing the handle of a gun, and attempted to pull it from his pants. Officer Caulfield grabbed Bloxton's right hand, shoved it and the gun back into the pocket and called his partners for assistance. Bloxton was handcuffed and Officer Caulfield took the gun from Bloxton's pocket. Officer Caulfield noticed the serial number was filed off.

¶ 37 "[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). An individual's refusal to cooperate with police, without

more, does not amount to reasonable suspicion. *Id.* However, flight is a "consummate act of evasion" and is "just the opposite" of going about one's business. *Id.* at 124-25. "Unprovoked flight in the face of a potential encounter with police may raise enough suspicion to justify the ensuing pursuit and investigatory stop." *People v. Thomas*, 198 Ill. 2d 103, 113 (2001). The facts of this case, found by the circuit court to be credible, clearly showed that Officer Caufield was justified in effectuating a *Terry* stop.

¶ 38    The issue raised by defendant here has been raised in numerous cases post-*Aguilar*. In *People v. Salgado*, 2019 IL App (1st) 171377, ¶ 3, Chicago police officers were on patrol at 3800 block of West 30th Street due to retaliatory shootings that had occurred in the area between rival gangs. As the officers drove down the block in an unmarked squad car, one of the officers made eye contact with one of two males walking in public on the sidewalk. The men immediately broke apart and walked in different directions. Defendant, who was one of the men, was adjusting and grabbing at something in his waistband. *Id.* The police drove past defendant, stopped the car, and Sergeant Rivera exited the passenger side. He walked toward defendant, and defendant continued to grasp at the object in his waistband. *Id.* ¶ 4. Sergeant Rivera asked him if he had any weapons in his possession. Defendant answered " 'no' " and continued to walk past him. Sergeant Rivera asked defendant to lift his t-shirt so he could " 'see.' " *Id.* ¶ 5. Defendant responded, " 'I don't have to' " and simultaneously grabbed the object in his waistband. *Id.* Sergeant Rivera immediately placed his hand on the object, which was covered by defendant's t-shirt. The object was a handgun, loaded with 10 live rounds. The serial numbers on the gun had been removed. Defendant was placed under arrest. *Id.* The trial court denied the defendant's motion to quash and suppress. *Id.* ¶ 11.

¶ 39    On appeal, the defendant argued that the trial court incorrectly denied his motion to suppress the firearm. *Id.* ¶ 12. The court found:

> "The fact that the stop occurred in a high crime area is a relevant contextual consideration in any *Terry* analysis. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). A police officer is 'not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.' " *Salgado*, 2019 IL App (1st) 171377, ¶ 25.

However, the court found that the defendant's mere presence in the area was not, standing alone, sufficient to justify a *Terry* stop. *Id.* ¶ 26. Ultimately the court found that "[c]onduct, not mere presence in the high crime area, is at issue in this case." *Id.*

¶ 40    After hearing Sergeant Rivera's testimony and watching his body camera footage, the trial court found that defendant " 'depart[ed]' " upon making eye contact with Sergeant Rivera and made repeated " 'movements towards his right waistband,' " which led Sergeant Rivera to believe that the defendant was in possession of a weapon. *Id.* ¶ 27. The *Salgado* court held:

> "in light of the trial court's factual findings and given the totality of the circumstances, defendant's presence in a high crime area where retaliatory gunfire had been exchanged between rival gangs, his actions upon seeing the police, and more importantly, defendant's unusual conduct-based fixation with an item in his waistband together gave rise to a reasonable suspicion that criminal activity was afoot such that Sergeant Rivera's actions were justified. [*People v. Johnson*], 2019 IL App (1st) 161104, ¶ 15 (the totality of the circumstances are to be considered when determining the validity of a stop)." *Salgado*, 2019 IL App (1st) 171377, ¶ 32.

¶ 41　　　　The court further stated:

"We reject out of hand defendant's argument that Sergeant Rivera's actions were unjustified because the '[a]rticulable suspicion to conduct a *Terry* stop cannot rest on the possible observation of a gun alone.' As explained above, defendant's conduct in a high crime area, not 'the possible observation of a gun alone,' gave rise to a reasonable suspicion that he was committing or about to commit a crime." (Emphasis omitted.) *Id.* ¶ 33.

¶ 42　In *People v. Thomas*, 2019 IL App (1st) 170474, the defendant was arrested and charged with aggravated unlawful use of a weapon after police observed him hand off a gun to his friend in the common area of a multiunit apartment building and then flee into an upstairs apartment unit. *Id.* ¶ 1. The defendant filed a motion to quash his arrest and suppress evidence asserting that he was illegally stopped without reasonable suspicion and arrested without probable cause. *Id.* ¶ 4. At the hearing on the motion to suppress, the arresting officer testified that he and his partner were patrolling due to the illegal activities of two rival gangs. *Id.* As the officers drove down the street, they observed four or five men standing in front of an apartment building. The defendant and his friend fled into the building. The arresting officer did not observe defendant holding a gun. *Id.* The officer pulled over, exited the vehicle, and followed the defendant and his friend into the building. He lost sight of the defendant and his friend for several seconds because the door closed behind them. When he reopened the door and stepped into the common area, he saw the defendant and his friend standing in a hallway. *Id.* ¶¶ 5-6. Both men looked in his direction, and the defendant promptly handed his friend a handgun and then fled upstairs to the second floor into an apartment and closed the door behind him. *Id.* ¶ 6. The friend threw the handgun on the second-stair landing

and was detained. *Id.* The officer recovered the loaded firearm and then returned to the apartment unit to which the defendant had fled. *Id.* ¶ 7. A woman opened the door, and the defendant was arrested. The defendant was transported to the police station, where the officers learned that the defendant did not have a FOID card or Concealed Carry License (CCL). *Id.* The trial court granted the defendant's motion, concluding, in pertinent part, that when the police observed the defendant with a handgun, they did not have probable cause to stop, seize, and arrest defendant given the laws permitting the public to possess guns outside the home via a FOID card or CCL. *Id.* ¶ 12.

¶ 43     On appeal, we analyzed whether the officers had probable cause to arrest the defendant. *Id.* ¶¶ 34-40. We first noted that in *Aguilar*, 2013 IL 112116, ¶¶ 20-22, our supreme court held unconstitutional the categorical ban on the use and possession of operable firearms for self-defense outside the home, but recognized that the right to such use and possession was subject to meaningful regulation, such as the requirement of a FOID card or CCL to do so. *Thomas*, 2019 IL App (1st) 170474, ¶ 36. In determining the officers had probable cause to arrest the defendant, we noted the defendant (1) fled into an apartment building after looking directly at the officers and closed the door behind him, (2) handed a gun to his friend in the common area of the apartment building after seeing the officers inside the building, in plain sight of the officers, and (3) then fled upstairs into an apartment unit and locked the door behind him. *Id.* ¶ 38. We concluded these facts "gave police probable cause to believe at the very least that defendant illegally possessed the gun" where they indicated, in part, a probability that the defendant did not have the necessary licenses. *Id.* In addition, we concluded that the arresting officer's experience and the fact he was patrolling the area due to the activities of rival gangs added to the totality of the circumstances justifying probable cause. *Id.*

¶ 44    Another division of the First District also recently found that a defendant's "efforts to conceal and toss the gun were sufficient to provide the officers with a reasonable suspicion that he was not in lawful possession of the gun." *People v. Hood*, 2019 IL App (1st) 162194, ¶ 71.

¶ 45    Arguments like that raised by defendant in this case have also been raised in relation to vehicle searches. In *People v. Lawrence*, 2018 IL App (1st) 161267, ¶ 5, the defendant moved to quash his arrest and suppress the gun seized from him, claiming that the traffic stop exceeded its permissible scope and, thus, resulted in his illegal arrest. At the suppression hearing the officer testified that he observed a driver commit a traffic violation, so he stopped the vehicle. The defendant was in the front passenger seat. When the two officers approached the vehicle, one of the officers observed that defendant was " 'moving around' " with a handgun sticking out of the front pocket of his hooded sweatshirt. *Id.* ¶ 6. The officer was able to observe " '[a]lmost the entire gun,' " including " 'the grip, the back handle' " and " 'most of the [gun's] barrel.' " *Id.* He informed his partner that he had observed a gun; he withdrew his own gun and directed defendant to exit the vehicle. Defendant complied and was promptly arrested. *Id.* ¶ 7. The court denied the motion. *Id.* ¶ 8.

¶ 46    The defendant moved to reconsider on the ground that the officers lacked probable cause to arrest him, since possessing a firearm is not, by itself, a crime. The trial court permitted defendant to reopen testimony, and the suppression hearing resumed. *Id.* ¶ 9. The officer testified that, as he took possession of the gun from defendant, defendant stated, " 'it's a lighter, not a handgun.' " *Id.* ¶ 10. The officer handed the gun to his partner, who determined that the gun was loaded. Defendant was then handcuffed and placed in the back of a police vehicle. Other officers drove defendant to the police station, which was " '[a]bout eight blocks' " from where the initial

stop occurred. *Id.* When the officers arrived at the police station, they learned that defendant (1) lacked a firearm owner's identification (FOID) card, (2) lacked a concealed carry permit, and (3) had a prior felony conviction. However, the officers did not know these facts when he arrested defendant. *Id.* The trial court again denied the motion. *Id.* ¶ 11.

¶ 47    The defendant appealed and argued that, at the moment of arrest, the officers did not know that defendant lacked a FOID card or a concealed carry permit or that he was a convicted felon and, thus, they lacked probable cause. *Id.* ¶ 41. We rejected the defendant's claim, finding that the defendant's false exculpatory statement was probative of his consciousness of his guilt. *Id.* ¶¶ 42, 47. In addition, we reasoned that, similar to a drug arrest where the police officer did not actually observe the illegal substance prior to the arrest (*e.g.*, *People v. Harris*, 352 Ill. App. 3d 63, 66-68 (2004)),

> "probable cause did not require the officers to verify defendant's lack of a FOID card prior to arrest once they had heard his false exculpatory statement. Similar to a drug case where officers act promptly to confirm the illegal nature of the substance seized, so too the officers in the case at bar acted promptly to confirm defendant's illegal possession of the item seized." *Lawrence*, 2018 IL App (1st) 161267, ¶ 44.

See also *People v. Balark*, 2019 IL App (1st) 171626.

¶ 48    In the instant case, defendant made eye contact with Officer Caulfield and then promptly walked away. Officer Caulfield saw a bugle in defendant's pants pocket, which he believed to be a firearm. Defendant ignored Officer Caulfield's requests to stop and continued into a gated area and onto a porch. Officer Caulfield followed defendant. When they reached the porch, defendant attempted to remove the firearm from his front pocket, and Officer Caulfield quickly shoved the

firearm back into Bloxton's pocket. At that point, defendant was arrested. The officer's testimony that he was working in a high crime area, the officer's observations, as well as defendant's actions on seeing police and his attempt to enter a nearby building, in totality, are facts that gave police probable cause to believe at the very least that defendant illegally possessed the gun. See *People v. Grant*, 2013 IL 112734, ¶ 11 (noting probable cause to arrest exists when the totality of the facts and circumstances known to the officer at the time are such that a reasonably cautious person would believe that the suspect is committing or has committed a crime); see also *People v. Williams*, 266 Ill. App. 3d 752, 760 (1994) (the trier of fact could infer that the defendant who ran from police and threw his gun into the garbage did not have a FOID card while fleeing from police); see *People v. Rainey*, 302 Ill. App. 3d 1011, 1013 (1999) (noting, for probable cause, the totality of the circumstances known to the officer at the time of the arrest includes the officer's factual knowledge and his prior law enforcement experience).

¶ 49     In my opinion, a reasonable and rational inference to be drawn from the officer's testimony is that the police presence and a potential police encounter is what prompted defendant's flight, and as he fled, the officer observed a bulge in defendant's pants pocket that he believed to be a firearm, giving rise to reasonable suspicion. See *People v. Jackson*, 2012 IL App (1st) 103300, ¶ 23. Once defendant fled, and after the defendant attempted to remove the firearm from his front pocket, the officers had probable cause to arrest defendant. Mere gun possession was not the scenario that presented itself to the police in this case, since the recovered firearm was defaced, a crime. Instead, the totality of the circumstances suggested criminal activity. The majority found that a police officer acted unlawfully by (1) following someone who had a bulge in his pant pocket, which the officer reasonably believed to be a firearm, and who fled upon seeing the officer; (2)

stopping the person from removing the weapon from his pant pocket as the officer approached; and (3) discovering, upon examination, that the weapon had a defaced serial number. This finding is contrary to the law and common sense.

¶ 50    For the foregoing reasons, I would affirm the trial court's denial of defendant's motion to quash arrest and suppress evidence.

_____

**No. 1-18-1216**

_____

| | |
|---|---|
| **Cite as:** | *People v. Bloxton*, 2020 IL App (1st) 181216 |

_____

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-17955; the Hon. Vincent M. Gaughan, Judge, presiding. |

_____

| | |
|---|---|
| **Attorneys for Appellant:** | DePaul University Legal Clinic, of Chicago (Aliza R. Kaliski, of counsel, and Abigail Horvat, law student), for appellant. |

_____

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon J. Walters, and Victoria L. Kennedy, Assistant State's Attorneys, of counsel), for the People. |

_____