2025 IL App (1st) 240933

SECOND DIVISION
March 31, 2025

No. 1-24-0933

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 CR 08597 |
| | ) | |
| GERALD DORSEY, | ) | Honorable |
| | ) | Tyria B. Walton, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Howse concurred in the judgment and opinion.

**OPINION**

¶ 1 As defendant Gerald Dorsey packed some personal items into the trunk of an SUV on a residential street, a police officer saw what appeared to be a gun. In short order, police detained and handcuffed defendant, recovered a gun from a tote box in the SUV, and learned from defendant that he did not have a valid firearms license.

¶ 2 Defendant was charged with aggravated unlawful use of a weapon, based on his lack of a firearm owner's identification card (FOID) or concealed carry license (CCL), and unlawful use of a weapon by a felon. Defendant moved to suppress the gun as the fruit of an illegal seizure. After a hearing, the trial court granted the motion, and the State filed this interlocutory appeal.

¶ 3 The State claims the detention was not an arrest requiring probable cause, but rather a *Terry* stop, conducted for the purpose of determining whether defendant had a license, during which he was briefly, and permissibly, handcuffed for the safety of the officers. See *Terry v.*

No. 1-24-0933

*Ohio*, 392 U.S. 1 (1968).

¶ 4    But the suppression hearing made clear that the officers had nothing, beyond defendant's mere possession of a concealed firearm in public, on which to base a reasonable suspicion for a *Terry* stop. The constitutionally protected conduct of carrying a concealed firearm in public cannot, by itself, serve as a basis for reasonable suspicion to believe criminal activity is afoot under *Terry*. We affirm the suppression order.

¶ 5                                  BACKGROUND

¶ 6    The facts, for our purposes here, are those adduced at the suppression hearing. And there were only two sources: Chicago Police Officer Ronald Kaczmarek's testimony and the footage from his body-worn camera (BWC).

¶ 7    One afternoon in June 2023, Officers Kaczmarek and Alegria received a call from Officer Cortesy (also spelled Kortesie and Cortesi in the record), who was conducting surveillance on an unrelated matter on the 7400 block of South Champlain Avenue in Chicago. Cortesy said that he saw defendant walking between a residence and an SUV parked on the street, "just unloading boxes" and putting them in the back of the SUV. (In the BWC footage, defendant can later be heard claiming that his family had just been evicted from their apartment.)

¶ 8    The only other elaboration in the record is that Kaczmarek testified that the report he received was "of a man with a gun." On redirect, Kaczmarek confirmed that he learned no other information from Cortesy or from his own observation:

     "Q. Officer Cortesy did not tell you of any other illegal activity that he saw Mr.
     Dorsey doing?

     [Objection overruled.]

     A. No.

Q. And you didn't see Mr. Dorsey do any other illegal activity?

A. Just having—just having a firearm on a public way."

¶ 9    We are emphatic on this point because, more than once in its briefs on appeal, the State claims that Officer Cortesy, in his call to Kaczmarek, reported that he saw defendant remove a gun from his waistband and place it into a tote box in the back of the SUV. This rather important information may be contained within the police report, but it was not part of the evidence in this case. Officer Kaczmarek, the only witness, never testified to being told anything of this nature by Officer Cortesy or by anyone else. We cannot consider information that was not placed into evidence. See *People v. Carey*, 386 Ill. App. 3d 254, 270 (2008); *People v. Brown*, 249 Ill. App. 3d 986, 994 (1993) ("It is an elementary principle that an appellate court cannot consider matters outside the record."); see also *In re Estate of Frakes*, 2020 IL App (3d) 180649, ¶ 38 (police reports are generally inadmissible as substantive evidence).

¶ 10    In any event, Cortesy called for assistance. Kaczmarek and Alegria soon pulled up, in plain clothes and an unmarked car. Kaczmarek and Alegria parked and walked briskly toward defendant, who was standing near the back of the SUV. The rear tailgate was open, but it seems from the BWC that defendant was in the process of closing it. As the officers approached, Kaczmarek saw what looked like the handle of a gun sticking out of a tote box. The BWC confirms that observation. It also confirms that the officers immediately grabbed defendant, unequivocally seizing him from the very start of the encounter. And within seconds, they had moved him over to the police vehicle, where they handcuffed defendant.

¶ 11    Kaczmarek testified that defendant was handcuffed for two reasons. For one, there was a gun within "arm's reach" of defendant. That is obvious enough from the BWC. For another, when the officers grabbed defendant and pulled him away from the SUV, "it felt like he was

trying to resist." The trial court did not believe this second basis. After viewing the BWC footage, the court found that defendant did not resist the officers.

¶ 12    For what it's worth, Kaczmarek did not consider defendant to be under arrest at this time. He was seized, to be sure, as he was not free to leave, but the seizure was a *Terry* detention, in his view, not an arrest. As Kaczmarek put it, defendant was "being detained for further investigation," namely, to determine whether he was licensed to carry a gun.

¶ 13    When asked if there was a weapon in the car, defendant said that the car belonged to his mother. The officers reminded defendant that a gun, or at least a suspected gun, was sticking out from a tote box and plainly visible from their collective vantage point. The officers removed the suspected gun and confirmed that it was both real and loaded. So they asked defendant if he had a FOID card or a CCL. Defendant acknowledged that he had neither. At that point—no more than 30 seconds after he was first handcuffed—defendant was under arrest.

¶ 14    Defendant argued in the trial court that he was arrested when he was handcuffed, almost immediately after his encounter with the police began, and that mere possession of a gun, as we held in *People v. Bloxton*, 2020 IL App (1st) 181216, ¶ 19, no longer creates probable cause for an arrest. The State countered that defendant was not arrested until the officers learned that he lacked a FOID card or CCL, at which point they had probable cause; the initial seizure was a brief *Terry* detention, with handcuffing for officer safety. The reason for the detention was to allow the officers to determine whether defendant had a valid firearms license. That was all the State said by way of articulating the reasonable suspicion necessary for a *Terry* stop.

¶ 15    The trial court did not determine whether defendant was arrested or merely subjected to a *Terry* stop; either way, in the court's view, defendant was "not free to go" and thus was seized. The important point, as we understand the trial court's view, was that the police seized him

*before* they knew that he was not licensed to carry a gun. The police thus ran afoul of *Bloxton* by failing to discover this information before the seizure.

¶ 16    The State moved for reconsideration, reiterating that the initial seizure was a *Terry* stop, and thus *Bloxton* did not apply. The trial court denied the motion. The State appealed, certifying that the ruling substantially impaired its case. See Ill. S. Ct. R. 604(a)(1) (eff. April 15, 2024).

¶ 17                                    ANALYSIS

¶ 18    The State argues that the trial court erred in suppressing the gun as the fruit of an illegal seizure. To this end, the State argues that (1) defendant's initial detention was a *Terry* stop, not an arrest, and (2) the stop was based on reasonable suspicion.

¶ 19                                        I

¶ 20    We note at the outset the importance of distinguishing between arrests and *Terry* stops. A *Terry* stop involves a "wholly different kind of intrusion upon individual freedom" than an arrest. *Terry*, 392 U.S. at 26. And it thus requires " 'considerably less' " justification than an arrest. *People v. Colyar*, 2013 IL 111835, ¶ 69 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). So even though both an arrest and a *Terry* stop are "seizures" in which the individual is not free to leave, the level of *justification* for the seizure will vary based on the *type* of seizure.

¶ 21    We said nothing different in *Bloxton*, 2020 IL App (1st) 181216, ¶¶ 19-20, which held only that *probable cause* for an *arrest*, based on an illegal gun possession, does not arise until the status of the person's licensure has been determined. *Bloxton* did not purport to announce a more general requirement for seizures of all kinds—certainly not for a *Terry* stop. See *id.* ¶ 23 ("[T]he State does not contend that the officers were making a *Terry* stop.").

¶ 22    The case law recognizing the constitutional right to carry firearms in public informs the standards for both probable cause (to arrest) and reasonable suspicion (to conduct a *Terry* stop).

No. 1-24-0933

See *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 32 (2022); *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010); *People v. Aguilar*, 2013 IL 112116, ¶¶ 15-21; *Bloxton*, 2020 IL App (1st) 181216, ¶¶ 19, 22. As this court noted, at least regarding probable cause:

> "We wish to emphasize that under the current legal landscape, police cannot simply assume a person who possesses a firearm outside the home is involved in criminal activity. Likewise, they cannot use a firearm in partial view, such as a semi-exposed gun protruding from the pant pocket of a person on a public street, alone as probable cause to arrest an individual for illegal possession without first identifying whether the individual has the necessary licenses. We thus caution against an 'arrest first, determine licensure later' method of police patrol." *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 40.

See also *United States v. Williams*, 731 F.3d 678, 694 (7th Cir. 2013) (Hamilton, J., concurring in part and concurring in judgment) ("After *Heller* and *McDonald*, all of us involved in law enforcement, including judges, prosecutors, defense attorneys, and police officers, will need to reevaluate our thinking about these Fourth Amendment issues and how private possession of firearms figures into our thinking.").

¶ 23                                                    II

¶ 24    The State first claims that the officer had reasonable suspicion for a *Terry* stop and, for that matter, probable cause to arrest, regardless of whether defendant had a CCL. As the State interprets the statute governing unlawful possession of weapons, defendant was in violation of the law even if he had a CCL, so Officer Kaczmarek had at least reasonable suspicion, if not probable cause, without needing to know whether defendant was the holder of a CCL.

¶ 25    The State has forfeited this argument, a charge it often lodges against defendants but which applies to the State here as the appellant. The only argument the State ever made below is

- 6 -

that the seizure in question was a *Terry* stop, not an arrest. The State did not make this statutory argument at the suppression hearing or in its motion to reconsider. And the record does not include any initial (written) response to the motion to suppress, assuming the State filed one. See *People v. Coleman*, 227 Ill. 2d 426, 433 (2008) (failure to raise argument at suppression hearing may result in forfeiture). Still, the court is not limited by forfeiture, and we reach the merits to maintain a sound body of precedent. See *People v. Acosta*, 2024 IL App (2d) 230475, ¶ 15.

¶ 26    Specifically, the State argues that, at the time Kaczmarek approached him, defendant unlawfully possessed the weapon under section 24-1(a)(4) of the criminal code. See 720 ILCS 5/24-1(a)(4) (West 2022) ("A person commits the offense of unlawful use of weapons when he knowingly *** possesses *** concealed on or about his person *** any *** firearm ***.").

¶ 27    The State says that, as the gun was partially concealed inside a tote box that was immediately accessible to defendant—within his arm's reach, according to the officer—the gun was "on or about his person" or, more specifically, "about his person." *Id.*; see *People v. Wise*, 2021 IL 125392, ¶ 25 (statutory phrase "about his person" means the suspect "has knowledge of the presence of the weapon and exercises immediate and exclusive control over the area where the firearm is found" (internal quotation marks omitted)).

¶ 28    So far, we agree with the State. The gun was concealed in part (Kaczmarek estimated that about "30, 40 percent" of the gun was showing, which squares with the BWC footage). And the gun was "about [defendant's] person," as it was within his arm's reach, as the BWC confirms.

¶ 29    But given the constitutional protections now recognized for gun possession and carriage, the relevant statute governing unlawful possession of weapons, section 24-1, recognizes various exceptions. The exception relevant here is for holders of a CCL. The State says this exception doesn't apply, but it clearly does.

¶ 30    Specifically, the criminal prohibition in subsection (a)(4) of section 24-1 "does not apply to *** weapons that *** (iv) are carried or possessed in accordance with the Firearm Concealed Carry Act by a person who has been issued a currently valid license under the Firearm Concealed Carry Act." 720 ILCS 5/24-1(a)(4) (West 2022). The Firearm Concealed Carry Act (Concealed Carry Act), in turn, provides that a CCL holder, among other things, may "carry a loaded or unloaded concealed firearm, fully concealed or partially concealed, on or about his or her person." 430 ILCS 66/10(c)(1) (West 2022).

¶ 31    That exception describes defendant's conduct here (putting aside for the moment that he did not have a CCL). The firearm inside the tote box was partially concealed and, given that it was within arm's reach of defendant, was "about his person." An individual with a CCL would be acting in compliance with the law under the facts known to Officer Kaczmarek at the time.

¶ 32    The State misreads section 24-1(a)(4)'s exceptions. The State says the four exceptions to criminality in subsection (a)(4) only relate to the *transportation* of weapons. But that is not what the statute says. Subsection (a)(4) *includes* exceptions relating to the transportation of weapons but is not limited to that conduct. The relevant portion of subsection (a)(4), relating to its exceptions to the unlawful possession of a firearm, reads as follows:

"(4) *** except that this subsection (a)(4) *does not apply to or affect transportation of* weapons that meet one of the following conditions:

***

(iv) are carried or possessed in accordance with the Firearm Concealed Carry Act by a person who has been issued a currently valid license under the Firearm Concealed Carry Act[.]" (Emphasis added.) 720 ILCS 5/24-1(a)(4) (West 2022).

- 8 -

¶ 33    The phrases "apply to" and "affect transportation of" each independently modify the word "weapons." There is no other way to read it. Thus, the criminal prohibition in subsection (a)(4) does not "apply to *** weapons" or "affect transportation of weapons" "that meet one of the following conditions," including compliance with the Concealed Carry Act. And that only makes sense. The courts have now made it clear that the right to publicly carry a firearm is a constitutional right. It would be bizarre (and almost assuredly unconstitutional) if the law permitted exceptions for the transportation of weapons but not for their mere carriage in public.

¶ 34    So defendant's conduct, insofar as Officer Kaczmarek witnessed it, was not illegal on its face. Nor did Kaczmarek testify to anything else about defendant's behavior or other circumstances warranting suspicion. He did not flee. He made no furtive movements. He did not try to hide or dispose of the weapon. He did not reach for the weapon at all. *Cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (suspect launched into "[h]eadlong flight"); *People v. Jenkins*, 2021 IL App (1st) 200458, ¶¶ 43-44 (defendant crouched behind parked cars, "walked, 'like a duck' " to his car, and jettisoned gun before entering store); *People v. Spain*, 2019 IL App (1st) 163184, ¶ 34 (after police responded to tip that multiple gang members were planning to kill rival gang member, officer saw defendant "turn away from him" and " 'try to stuff [gun] down his pants' "); *People v. Hood*, 2019 IL App (1st) 162194, ¶ 68 (defendant, seated in front seat of car, made " 'quick, furtive movements' " toward floorboard, placed object in dark bag, and threw it into back seat of vehicle).

¶ 35    The BWC confirms this; Officer Kaczmarek had his hands on defendant almost instantly after leaving his vehicle. Perhaps the officer acted so swiftly that defendant had no chance to take any evasive action; either way, the point remains. Neither Kaczmarek's testimony nor the BWC footage reveal any suspicious behavior or circumstance beyond the presence of the

partially concealed firearm in the tote box within arm's reach of defendant.

¶ 36    Simply put, the only basis for suspecting that defendant might be committing a crime required the answer to a question the officer did not know: whether defendant had a valid CCL.

¶ 37                                III

¶ 38    The State insists that *Bloxton*'s holding—that the mere possession of a firearm in public does not provide probable cause to arrest—is not applicable here, as the officer's detention of defendant, brief as it was despite the presence of handcuffs, was a *Terry* stop, not an arrest, and thus required only the lower standard of reasonable suspicion.

¶ 39    It is a debatable point, to be sure. The use of handcuffs does not automatically equate to an arrest. A suspect may be restrained in handcuffs during a *Terry* stop if "reasonably necessary for [officer] safety." *People v. Arnold*, 394 Ill. App. 3d 63, 71 (2009); see *Colyar*, 2013 IL 111835, ¶ 46. But of course, that assumes a preexisting basis for a *Terry* stop—that the officers had a reasonable, articulable suspicion that criminal activity was afoot—before the handcuffs came out. See *Terry*, 392 U.S. at 30; *People v. Gherna*, 203 Ill. 2d 165, 177 (2003).

¶ 40    As already noted, neither Kaczmarek's testimony nor the BWC reveal any basis for reasonable suspicion of criminal activity, besides the naked fact that defendant had a partially concealed weapon on or about his person. So assuming for the moment that the detention of defendant was a *Terry* stop, was this fact alone enough for reasonable suspicion?

¶ 41    This question does not turn on the resolution of any factual disputes. So our question is one of pure law and our review *de novo*. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001) (we "review *de novo* the ultimate finding with respect to probable cause or reasonable suspicion"); see *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

¶ 42    The police routinely encounter, and must act quickly to resolve, situations of uncertain or

"ambiguous" legality. *Wardlow*, 528 U.S. at 125. That is, criminal activity "may be afoot," but then again, the observed conduct might also prove "susceptible of an innocent explanation" and thus lawful upon a closer look. *Terry*, 392 U.S. at 30; *Wardlow*, 528 U.S. at 125. The *Terry* rule allows an officer to conduct a brief investigative stop to resolve a perceived ambiguity of this kind, as long as the stop is justified by a reasonable suspicion of criminal activity.

¶ 43   Reasonable suspicion is an "elusive" and "somewhat abstract" concept not reducible to "a neat set of legal rules." (Internal quotation marks omitted.) *United States v. Arvizu*, 534 U.S. 266, 274 (2002). But generally speaking, the police must be aware of " 'specific and articulable facts which, taken together with rational inferences from those facts,' " allow them to reasonably conclude that the person has committed, or is about to commit, a crime. *People v. Close*, 238 Ill. 2d 497, 505 (2010) (quoting *Terry*, 392 U.S. at 21).

¶ 44   The facts need not amount to probable cause, but an "inarticulate hunch" is not enough. *Id.* As our supreme court put it, "[v]iewed as a whole, the situation confronting the police officer must be so far from the ordinary that any competent officer would be expected to act quickly" to investigate it. *People v. Thomas*, 198 Ill. 2d 103, 110 (2001).

¶ 45   Because the underlying purpose of a *Terry* stop is to resolve the ambiguity in observed conduct, it follows that that the police are not required to rule out all innocent explanations for the conduct before initiating a stop. The *Terry* rule necessarily accepts some risk that innocent people will be stopped from time to time. *Wardlow*, 528 U.S. at 126; *Arvizu*, 534 U.S. at 277.

¶ 46   That said, the mere possibility of criminal activity is not enough to create a reasonable suspicion, for that possibility is virtually *always* present, no matter what the observed conduct may be. *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1014 (7th Cir. 2016). True, "the presence or use of guns is not always legal," but without more, a "report of guns in public does

not suggest likely criminal activity," at least not in a jurisdiction where, as in Illinois, "carrying a firearm in public is permitted with a license." *United States v. Watson*, 900 F.3d 892, 895-96 (7th Cir. 2018).

¶ 47 Anyone carrying a gun in public in Illinois *might* not have a CCL and thus *might* be guilty of unlawful possession. A justification based on that sole fact thus lacks any "particularized and objective basis for suspecting the particular person stopped of criminal activity." (Internal quotation marks omitted.) *Navarette v. California*, 572 U.S. 393, 396 (2014). It would allow the police to stop, in an indiscriminate or wholesale fashion, "a very large category of presumably innocent [people], who would be subject to virtually random seizures." *Reid v. Georgia*, 448 U.S. 438, 441 (1980). The rule sweeps too broadly to be reasonable under the fourth amendment. And that is doubly true, given that the conduct the officer observed here was not only law-abiding (on its face, at least) but *constitutionally protected*.

¶ 48 The parties have not directed us to any Illinois decision that has squarely addressed this question. A federal court in Chicago, however, agreed with our conclusion that "the mere presence of a concealed weapon, without more, cannot support a reasonable suspicion that the suspect is illegally carrying that gun." *United States v. Jones*, 708 F. Supp. 3d 1365, 1375 (N.D. Ill. 2023) (construing Illinois law). The Seventh Circuit, though in a case arising in Indiana, reached the same conclusion. See *Watson*, 900 F.3d at 896 (" 'a mere possibility of unlawful use' of a gun is not sufficient to establish reasonable suspicion" (quoting *Paniagua-Garcia*, 813 F.3d at 1014-15) (construing Indiana law)).

¶ 49 Other federal courts have widely agreed that the possession of a firearm in public does not, alone, create reasonable suspicion for a *Terry* stop. See *Northrup v. City of Toledo Police Department*, 785 F.3d 1128, 1132 (6th Cir. 2015) ("There is no 'automatic firearm exception' to

the *Terry* rule."); *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) ("the exercise of this right [to carry firearms], without more, cannot justify an investigatory detention"); *United States v. Lewis*, 672 F.3d 232, 240 (3d Cir. 2012) (informant's tip that suspect had firearms in car did not "permit an officer to suspect—let alone reasonably suspect—that possession of either firearm was illegal or that the firearms were being used in a criminal manner"); *United States v. McHugh*, 639 F.3d 1250, 1257 (10th Cir. 2011) (suspicion that defendant had weapon in car, "standing alone, does not establish reasonable suspicion" to justify seizure under *Terry* ); see also *Commonwealth v. Couture*, 552 N.E.2d 538, 541 (Mass. 1990) ("The mere possession of a handgun was not sufficient to give rise to a reasonable suspicion that the defendant was illegally carrying that gun ***.").

¶ 50     Conduct that, on its face, is nothing more than the exercise of a protected constitutional right cannot automatically subject a citizen to police detention. Because this right is subject to reasonable regulation, however, nothing prevents the police from inquiring, in a consensual encounter, into the status of the citizen's licensure. Or if the police have a valid, independent basis for an investigatory stop, the police may ask the individual if he or she possesses a CCL, and the license holder is required to disclose that he or she possesses a concealed firearm, present his or her license, and identify the firearm's location. 430 ILCS 66/10 (h) (West 2022).

¶ 51     But the mere possibility that anyone with a gun might not have a valid license is not enough to justify a seizure. For that, the police must have specific and articulable reasons to believe that *this* person, observed in *these* circumstances, does not have a valid license—or that he is otherwise implicated in imminent criminal activity. See *Navarette*, 572 U.S. at 396.

¶ 52     The police, no doubt, will often present such reasons at a suppression hearing, and we will take those cases as they come. But here they did not. They acted on nothing more than "a

man with a gun" in public. And that alone is not—not any longer—a basis for a seizure or detention of any kind, even if the officers were "understandably worried about the possibility of violence and want[ed] to take quick action" to avert it. *Watson*, 900 F.3d at 897.

¶ 53 The State's principal citations do not hold otherwise. In *People v. Wallace*, 2023 IL App (1st) 200917, ¶¶ 16, 21, the police stopped a car on probable cause that a traffic violation was committed, saw a bulge in the defendant's pocket, and frisked him for weapons. We held, as the State points out, that the officers did not have to determine whether the defendant had a valid FOID card or CCL before frisking him. *Id.* ¶ 24.

¶ 54 Fine, but unhelpful here. A stop and a frisk are separate actions requiring separate justifications. *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009); *Sorenson*, 196 Ill. 2d at 433. The justification for a frisk is always officer safety: during a valid stop, the police may frisk a suspect for weapons if they have a reasonable suspicion that he is "armed and dangerous." *Arizona v. Johnson*, 555 U.S. at 326-27; see *Terry*, 392 U.S. at 30-31; *Colyar*, 2013 IL 111835, ¶ 37; 725 ILCS 5/108-1.01 (West 2022).

¶ 55 And a concern for officer safety during the stop of an armed suspect is surely reasonable, regardless of whether the suspect has a valid firearm license. That is why, as just noted, our legislature requires CCL holders to disclose their firearms and allow the police to "safely secure" them for the duration of an "investigative stop." 430 ILCS 66/10(h) (West 2022). In short, *Wallace* is irrelevant: it does not hold or imply anything about the reasonable suspicion that is necessary to *stop* someone for possession of a firearm in the first place.

¶ 56 In *People v. McMichaels*, 2019 IL App (1st) 163053, ¶ 4, the police responded to a "man with a gun" tip. But critically, we held that the officers did *not* seize the defendant " 'immediately upon their arrival,' " as they did here. *Id.* ¶¶ 18-20, 24. Rather, we held that the

initial encounter was consensual, and that the police only seized the defendant after he thrust his hand into his pocket, where his gun was believed to be. *Id.* ¶ 23. Having a gun in public is one thing; grabbing hold of it when the police approach you is quite another. And that is not the kind of behavior that an officer should expect from a law-abiding, licensed gun holder, who could simply inform the officer that he has a valid firearms license and settle the matter right then and there. *Id.* ¶¶ 38-39.

¶ 57    The seizure here, even granting that it was a *Terry* stop, was not based on reasonable suspicion and thus violated the fourth amendment. We uphold the court's suppression order.

¶ 58                                CONCLUSION

¶ 59    The judgment of the circuit court is affirmed.

¶ 60    Affirmed.

---

### *People v. Dorsey*, 2025 IL App (1st) 240933

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 23-CR-08597; the Hon. Tyria B. Walton, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, John E. Nowak, and Amy M. McGowan, Assistant State's Attorneys, of counsel), for the People. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Kaitin Powell and Colleen Gorman, Assistant Public Defenders, of counsel), for appellee. |

---