2021 IL App (1st) 180493-U

No. 1-18-0493

Order filed January 28, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 13 CR 20238 |
| | ) | |
| MILTON CONTRERAS, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Although defendant's counsel was deficient for failing to argue that his prior acts of sexual misconduct were not admissible to prove his propensity to commit the charged sex offenses, defendant was not prejudiced by the error. In light of the strong evidence of defendant's guilt and the admissibility of the other-crimes evidence for a non-propensity purpose, there is no reasonable probability that defendant would not have been convicted absent the deficient performance.

¶ 2    Following a jury trial, defendant Milton Contreras was convicted of aggravated criminal sexual abuse and indecent solicitation of a child for forcing a six-year-old boy to touch his penis.

On appeal, defendant argues that his attorneys were ineffective for failing to raise a meritorious argument in response to the State's request to admit evidence of his prior acts of sexual misconduct to demonstrate his propensity to commit the charged offenses.[1]

¶ 3    As relevant here, the State sought to present evidence that defendant had previously exposed his penis to children and masturbated in their presence, arguing that the evidence was admissible for propensity purposes under section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2014)). That statute creates an exception to the common law rule prohibiting admission of other-crimes evidence for propensity purposes, but the exception is limited to evidence of a defendant's commission of certain enumerated sex offenses. Although the prior acts described in the State's proffer do not constitute any of the statutorily enumerated offenses, defendant's trial counsel failed to argue that the State's other-crimes evidence was not admissible under the statute for propensity purposes. We agree with defendant that his trial counsel rendered constitutionally deficient performance by failing to raise this plainly meritorious argument.

¶ 4    However, we also conclude that defendant was not prejudiced by the deficiency. The evidence at trial included the testimony and out-of-court statements of the victim that defendant grabbed his hand and forced him to touch his penis. The State also presented evidence that defendant made custodial statements admitting that the victim touched his penis but claiming that the victim initiated the contact. Because defendant attempted to shift blame for the encounter to the victim, evidence of his commission of other sex offenses involving children was relevant and

---

[1] Defendant was represented by different attorneys during pretrial, trial, and posttrial proceedings. We refer to these lawyers collectively as defendant's trial counsel or trial attorneys.

admissible to establish his intent, notwithstanding its inadmissibility for propensity purposes. In light of the strong evidence of defendant's guilt and the admissibility of the other-crimes evidence for a non-propensity purpose, there is no reasonable probability that the result of defendant's trial would have been different if counsel had properly objected to the admission of the other-crimes evidence for propensity purposes. For these reasons, as explained more fully below, we affirm.[2]

¶ 5                                    I. BACKGROUND

¶ 6      The charges against defendant arose from an incident in September 2013, at a Salvation Army store in Chicago, when six-year-old M.Q. reported that defendant forced him to touch his penis.

¶ 7                                  A. Pretrial Proceedings

¶ 8      Before trial, the State moved to admit evidence that defendant committed several prior sex offenses involving children in public places. The State identified four such offenses: in April 2009, at another Salvation Army store in Chicago, defendant allegedly pressed his clothed, erect penis against a 12-year-old boy; in June 2011, at a K-Mart in Steger, Illinois, defendant allegedly fondled his penis inside his pants in the vicinity of male children; and in July 2013, in separate incidents at the Ford City Mall in Chicago, defendant allegedly exposed his penis and masturbated in front of two male children. The State argued that evidence of defendant's commission of these other offenses was relevant for several purposes, including to prove defendant's intent, identity, motive, absence of mistake or accident, and absence of an innocent frame of mind. The State also argued

---

[2] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

that the other-crimes evidence was admissible to establish defendant's propensity to commit sex offenses under section 115-7.3.

¶ 9     At a pretrial hearing on the motion, defendant's counsel, Gwendolyn Anderson, did not contest the admissibility of the other-crimes evidence for propensity purposes under section 115-7.3, conceding that "the statute allows it." Instead, counsel argued that allowing the State to present evidence of four prior incidents would be unduly prejudicial and urged the trial court to limit the State to just two prior offenses. Judge Crane, who presided over the pretrial hearing, excluded the 2009 incident, finding that the conduct alleged there was too dissimilar to the allegations presented here, but allowed the State to introduce evidence of the other incidents. Judge Crane did not specify the purposes for which the evidence would be admitted.

¶ 10    Judge Maldonado, who presided over the trial, addressed that question on the morning of trial. After indicating that defendant was not waiving his earlier objection to admission of the other-crimes evidence, defendant's new counsel, Joel Brodsky, argued that the court should limit the jury's consideration of the evidence to the issues of intent and propensity. While again noting defendant's general objection to the evidence, counsel conceded that, if the evidence were allowed, it "obviously" would be proper for the jury to consider it for propensity purposes. Judge Maldonado ruled that the evidence would be admitted on the issues of defendant's intent, identity, and propensity.

¶ 11    The State also filed a pretrial motion to introduce out-of-court statements that M.Q. made to his grandmother, the Salvation Army store manager, and a forensic interviewer under section 115-10 of the Code (725 ILCS 5/115-10 (West 2014)). The trial court granted the motion, finding that the time, content, and circumstances of the statements provided sufficient safeguards of

reliability. Defendant does not challenge that ruling on appeal. Nor does he challenge the trial court's denial of his pretrial motion to suppress his custodial statements.

¶ 12                                    B. Trial

¶ 13    At trial, M.Q., then ten years old, testified that he went to the Salvation Army store with his grandparents on the evening of September 30, 2013, when he was six years old. At some point, M.Q. wandered away from his grandparents and into the store's Halloween aisle. As M.Q. was looking at items in the Halloween aisle, a man approached him and grabbed his hand. The man pulled down his pants and put M.Q.'s hand on his "front private part." M.Q. explained that, by "front private part," he meant the part of the body that men use to urinate. M.Q. testified that the man's front private part was hard and hairy. After about three seconds, the man released M.Q.'s hand. M.Q. then ran to his grandparents and told them and a store employee what had happened.

¶ 14    The following day, M.Q. met with Detective Emily Rodriguez, who showed him a photo array. In the photo array and at trial, M.Q. identified defendant as the man who made him touch his front private part. Although M.Q. testified that Detective Rodriguez told him which photo to select, both Detective Rodriguez and defendant's mother, Martha Jara, who was present when M.Q. was shown the photo array, testified that Detective Rodriguez did not tell M.Q. which photo to select.

¶ 15    On cross-examination, M.Q. acknowledged that he had difficulty remembering what happened at the Salvation Army store and that he could "only remember a little part" of the incident. He also acknowledged that, before testifying, he had spoken with the prosecutor, a detective, and his parents and grandmother, who explained to him what would happen in court and reminded him of what he had previously said.

¶ 16    M.Q.'s grandmother, Victoria Lema, testified that she was at the Salvation Army store with her husband and M.Q. on September 30, 2013. While she and her husband were shopping, M.Q. briefly wandered away from them. When M.Q. returned, he looked pale and scared and said he wanted to leave. M.Q. told Lema that a man had forced him to touch his "huevos." M.Q. said that the man told him he would not let him pass unless he touched him, and that the man then grabbed M.Q.'s hand and made M.Q. touch his "huevos." Lema reported the incident to the store manager. While she was doing so, a man emerged from an aisle, and Lema asked M.Q. if that was the man who had grabbed him. M.Q. nodded his head and hid behind a pillar. The man then threw a shirt onto the ground and left the store. When M.Q. returned home after the incident, he hid under a bed because he was frightened.

¶ 17    Jara testified that when she came home that evening, M.Q. was hiding under her bed and appeared scared. The next day, she took M.Q. to the Chicago Children's Advocacy Center, where Detective Rodriguez showed M.Q. a photo array and M.Q. spoke with a forensic interviewer. Jara testified that, when M.Q. was six years old, he would refer to his genitals, including his penis, as "huevos," a term he learned from his grandfather.

¶ 18    Julia Almanza, the Salvation Army store manager, testified that she was at the store on September 30, 2013, when Lema told her that something had happened to her grandson. Almanza asked M.Q. what happened, and M.Q. pointed to a man and said that the man told him that he would not let him pass through the aisle if he did not touch his "huevos." Almanza identified the man as defendant, whom she recognized as a regular customer at the store. After M.Q. pointed to defendant, defendant emerged from an aisle. M.Q. became scared, grabbed a pole, and would not say anything. Defendant was sweating profusely. Before anyone said anything to him, defendant

exclaimed, "I didn't do it, he's lying, I didn't do it." He then threw down some clothing and ran out of the store. Almanza followed him and took a picture of his car and license plate. When she returned to the store, she spoke with M.Q. again. M.Q. said that he was in an aisle when defendant pushed him toward some racks of clothing and told him that he would not let him pass unless he touched his "huevos." M.Q. also said that defendant made him touch his "huevos."

¶ 19 On cross-examination, Almanza testified that she had known defendant as a customer for several years. She testified that defendant would often donate women's wigs to the store, but she denied that he ever bought women's wigs or clothing. She testified that she met defendant through her former co-worker, Tabitha, who was a mutual friend of theirs, but she denied that defendant and Tabitha ever invited her to go out with them. She also denied knowing that defendant was gay or transgender. She testified that defendant became defensive and said he had not done anything after M.Q. pointed at him, but she denied asking defendant "what did you do" or confronting him before he started to leave the store.

¶ 20 Rebekah Stevenson, a forensic interviewer at the Children's Advocacy Center, testified that she interviewed M.Q. on October 1, 2013. The interview was conducted in Spanish. An audiovisual recording of the interview with English subtitles was played for the jury and a translated transcript was admitted as an exhibit. In the interview, M.Q. said that he was in the Halloween section of the store when a man grabbed his hand and told him that "I am not letting you pass." To demonstrate what happened, M.Q. stood up, raised his hand, and fell forward. He then said that, when he was at the store, his hand was bleeding, he touched a needle, and the man did something with a knife and scissors.

¶ 21    After M.Q. mentioned a knife and scissors, Stevenson asked him several questions about the difference between telling the truth and telling a lie. Stevenson testified that it is part of her standard protocol to ask such questions when interviewing children. She usually asks such questions at the start of an interview, but here M.Q. immediately began to discuss the details of what happened in the store. Stevenson explained that the purpose of asking such questions is to get the child to agree to tell the truth, which research suggests is a better indicator that the child's statements are truthful than is the child's ability to differentiate between the abstract concepts of truth and lies. Stevenson explained that, while children have difficulty understanding those abstract concepts, they do not have difficulty distinguishing reality from fantasy.

¶ 22    In the interview, Stevenson asked M.Q. whether it would be the truth or a lie to say there was a dog in the room. M.Q. said it would be the truth. Stevenson then asked M.Q., "is there a dog there?," and M.Q. said, "Yes, I have a dog here." Stevenson followed up again, asking M.Q., "But is there a dog sitting there?," and this time M.Q. answered, "No." Stevenson next asked M.Q. if it would be the truth or a lie to say that they were talking. M.Q. first answered that it would be a lie, but when Stevenson repeated the question, M.Q. said that it would not be a lie. Finally, Stevenson asked M.Q. if it would be the truth or a lie to say that he was four years old, and M.Q. answered that it would be a lie. Stevenson then told M.Q. that it was very important that he tell the truth during the interview, and M.Q. stated that he understood.

¶ 23    Returning to the subject of what happened in the store, Stevenson asked M.Q. to identify various body parts and asked whether anyone had touched those parts of his body. M.Q. stated that the man in the store touched his nose and mouth. He also stated that the man touched his hand and hit his leg. Stevenson then pointed to her groin area and asked M.Q. what that region is called on

a boy. M.Q. said "huevos." Stevenson asked M.Q. if anyone had touched his "huevos." M.Q. said no. But he went on to state that the man in the store took off his pants and made M.Q. touch his "huevos." M.Q. said that the man had a "beard" under his pants and that his "huevo" was yellow and blue. M.Q. also said that the man made him touch his bare buttocks.

¶ 24    Defendant voluntarily surrendered to police on October 2, 2013. At the police station that day, he was questioned by Detective Rodriguez and Detective Manuel De La Torre. Detective Rodriguez testified that Detective De La Torre orally advised defendant of his *Miranda* rights and defendant orally acknowledged that he understood those rights. Defendant then told the detectives that a "precocious" little boy had been following him around the store. He stated that the boy approached him and started rubbing his penis. Defendant stated that, after about five seconds, his penis became erect and protruded from his loose jogging pants and that the boy's hand then touched his bare penis. Defendant stated that he grabbed the boy's hand and pulled it away from him. At that point, a woman started calling for the boy, and the boy ran away from him. Defendant stated that Almanza then approached him, and he tried to explain himself to her, but she "didn't want to hear it." Defendant's conversation with the detectives was not recorded, and defendant did not make or sign a written statement.

¶ 25    Later that day, defendant had a second conversation with Assistant State's Attorney (ASA) Katherine Dussman. At trial, the parties stipulated that, if called, ASA Dussman would testify that she identified herself as an assistant State's attorney and advised defendant of his *Miranda* rights. After indicating that he understood his rights, defendant explained that he had gone to the Salvation Army store to look for clothing or furniture. He stated that a boy came up to him and touched his penis, causing it to become erect. He stated that the boy must have been able to see his penis

because he was wearing loose fitting pants. He stated that the only time he touched the boy was when he pushed the boy's hand away from his penis. He stated that he tried to explain what happened to the store manager, but she would not listen. He denied that he was sweating when the store manager confronted him and stated that the moisture on his face was from a recent chemical peel. ASA Dussman terminated the interview after defendant asked for an attorney.

¶ 26    Pursuant to the trial court's pretrial ruling, the State called two witnesses to testify about defendant's prior misconduct involving children. The trial court explained to the jury that the witnesses were going to testify that defendant was involved in conduct other than that which was charged in the indictment and instructed the jury that it could consider the evidence only for the limited purposes of determining defendant's intent, identity, and propensity to commit sexual abuse. The trial court delivered a similar instruction at the close of the case.

¶ 27    Kelsey Marquez testified that, on July 20, 2013, while she was at work at the Dollar Premium store inside the Ford City Mall, she saw defendant in an aisle roughly rubbing the area of his penis over his clothing. Marquez testified that, when a little boy walked into the aisle, defendant exposed his erect penis to the boy. After Marquez yelled for a co-worker to call mall security, defendant exited the store.

¶ 28    J.A. testified that he was at the Conway Resale store next to the Ford City Mall on July 20, 2013. He was 14 years old at the time. He testified that after he wandered away from his mother, defendant drew his attention by coughing and saying "hey." J.A. turned around and saw defendant touching his penis over his clothing. J.A. then walked away, and defendant followed him to a different area of the store. When J.A. looked at defendant, he saw that defendant's penis was exposed. J.A. told his mother, who confronted defendant. Defendant then left the store. When J.A.

and his mother exited the store a short time later, J.A. saw defendant being arrested and heard him say he "didn't do nothing." A mall security officer told J.A. and his mother that they would have to go to the police station to press charges against defendant, but they never did.

¶ 29    After the State rested, defendant testified on his own behalf. He explained that he is a transgender woman with male genitalia and that he dresses as a woman 80% of the time.[3] He testified that he has only one testicle due to a childhood accident and that he uses a "temporary testicle" that sometimes causes an allergic reaction, producing a blister with an itchy and burning sensation.

¶ 30    Defendant testified that he regularly shopped at the Salvation Army store for women's clothing and wigs. He had known Almanza for seven or eight years from visiting the various stores where she worked and saw her three or four times a week. He met Almanza's co-worker, Tabitha, at the same time he met Almanza, and he developed a friendship with her. Defendant testified that he and Tabitha often invited Almanza to go out with them, but she always declined. Defendant testified that Almanza treated him differently after she learned he was transgender, becoming "stoic and short" with him.

¶ 31    Defendant testified that he was at the Salvation Army store on the evening of September 30, 2013, and was not dressed in women's clothing or wearing a wig. He had just had a facial, or "chemical peel," so he had a layer of oily liquid on his face when he entered the store. He testified that he was talking on the phone with a friend and scratching a blister caused by his temporary testicle when he noticed a boy looking at him. He later saw the boy looking at him around the

---

[3] Because defendant's counsel at trial and on appeal refer to defendant using male pronouns, we do the same.

corner of a clothing rack, as though he were playing "peekaboo." Defendant testified that the boy walked toward him, stood in front of him, and "saw me, in my private parts." The boy then moved his hands nervously and ran away. Defendant denied touching or exposing himself to the boy.

¶ 32     After the boy ran away, defendant noticed that the boy was with Almanza. He testified that Almanza took the boy by the hand and pointed at defendant. Defendant then approached Almanza and asked her what the problem was. According to defendant, Almanza told him that she had called the police and had nothing to say to him. Defendant testified that he tried to reason with Almanza and the boy's grandmother, but Almanza ignored him and the grandmother just yelled hysterically. Defendant testified that he panicked and left the store.

¶ 33     Defendant testified that the detectives who questioned him did not advise him of his *Miranda* rights. According to defendant, Detective Rodriguez stated that he had better speak to them because the boy had already told them he saw defendant's penis, which defendant said was impossible. He offered to give a statement, but only with an attorney present. He told Detective Rodriguez that he needed to call his attorney but that the officer who arrested him had taken his phone. Defendant testified that the detectives nonetheless proceeded to question him, asking him what happened at the Salvation Army store. Defendant testified that he told the detectives the boy had been playing peekaboo with him and then ran away. He denied saying that the boy approached him and started rubbing his penis or that the boy was able to touch his bare penis because his pants were loose. He denied saying that the boy had seen his penis or testicle or that he had touched the boy.

¶ 34     Defendant testified that his conversation with the detectives ended when ASA Dussman entered the room and began a casual conversation with Detective Rodriguez. Defendant testified

that Detective Rodriguez told him to tell ASA Dussman what he had told the detectives. He testified that he tried to explain the situation to ASA Dussman, but she refused to talk to him. He testified that he told ASA Dussman that he had requested his lawyer several times, and that ASA Dussman then told him the meeting was over and left the room.

¶ 35    As for the earlier incidents at the Ford City Mall, defendant denied rubbing or exposing his penis in either store. Defendant testified that he first went into the Conway Resale store to buy new clothes because the clothes he was wearing had paint on them. (He testified that he was not wearing women's clothing that day.) While he was in the store, he noticed J.A. looking at him. According to defendant, J.A. nodded his head in an insulting manner and made derogatory comments under his breath. Defendant walked away, but he later saw J.A. whispering something to a woman, who stared at him. Defendant then decided to leave the store. He later went into the Dollar Premium store, but he left when he noticed a woman looking at him "in an accusing way." As he exited the store, he was stopped in the parking lot by two police officers and a mall security guard. He was arrested, but the case was later dismissed.

¶ 36    In closing argument, the State argued that the case ultimately came down to a credibility contest between M.Q. and defendant. The prosecutor urged the jury to credit M.Q.'s testimony and out-of-court statements that defendant grabbed his hand and forced him to touch his penis, and to reject as unbelievable defendant's custodial statements asserting that M.Q. approached him and touched his penis of his own accord. The prosecutor argued that M.Q. consistently relayed key details of his encounter with defendant in his statements to his grandmother and Almanza, his forensic interview with Stevenson, and his testimony at trial.

¶ 37 Addressing the other-crimes evidence, the prosecutor told the jury that it could consider the testimony about defendant's actions at the Ford City Mall when assessing M.Q.'s credibility. If defendant engaged in the conduct described by Marquez and J.A., the prosecutor argued, then "it is more likely than not" that he also committed the acts described by M.Q. In its rebuttal argument, the State argued that the other-crimes evidence showed defendant's "[p]ropensity" to "find[ ] little boys and *** expose[ ] his penis to them."

¶ 38 The jury returned verdicts finding defendant guilty of aggravated criminal sexual abuse and indecent solicitation of a child.

¶ 39                                C. Posttrial Proceedings

¶ 40 After retaining new counsel, Allan Milan, defendant filed a motion for a new trial, arguing (among other things) that the court erred in admitting the other-crimes evidence. In particular, new counsel argued that the probative value of the other-crimes evidence was outweighed by the danger of unfair prejudice because the prior conduct lacked sufficient factual similarity to the charged conduct and because defendant was never charged with or convicted of the prior offenses. The trial court denied the motion.

¶ 41 After hearing evidence in aggravation and mitigation, and considering a presentence investigation report, the trial court sentenced defendant to seven years in prison on the aggravated criminal sexual abuse conviction and a concurrent term of three years in prison on the indecent solicitation of a child conviction. The court denied defendant's motion to reconsider the sentence, and defendant filed a timely notice of appeal.

¶ 42                                    II. ANALYSIS

¶ 43    On appeal, defendant contends that his trial attorneys rendered ineffective assistance of counsel by failing to argue that the other-crimes evidence introduced by the State was not admissible for propensity purposes under section 115-7.3. To prevail, defendant must show that his counsel performed deficiently and that he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficient performance, defendant must show that his "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. When reviewing counsel's performance, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and that counsel's "challenged action[s] might be considered sound trial strategy." (Internal quotation marks omitted.) *Id.* at 689. With respect to prejudice, defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

¶ 44    We agree with defendant that his trial counsel performed deficiently in failing to raise a meritorious argument in response to the State's request to present other-crimes evidence for propensity purposes. Evidence of a defendant's uncharged criminal acts is generally inadmissible to demonstrate the defendant's propensity to commit a charged offense. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). Section 115-7.3, however, creates a limited exception to that general rule. It applies to cases in which a defendant is charged with: predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse, criminal sexual abuse, child pornography, aggravated child pornography, criminal transmission of HIV, or child abduction; battery, aggravated battery, first degree murder, or second degree murder when the commission of the offense involves sexual penetration or sexual conduct;

or any of the offenses formerly known as rape, deviate sexual assault, indecent liberties with a child, or aggravated indecent liberties with a child. 725 ILCS 5/115-7.3(a) (West 2014). Under the statute, if a defendant is charged with an enumerated offense, "evidence of the defendant's commission of another offense or offenses set forth in [the statute] may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant" (725 ILCS 5/115-7.3(b) (West 2014)), including "to show [the] defendant's propensity to commit sex offenses." *Donoho*, 204 Ill. 2d at 176.

¶ 45    Here, defendant was charged with aggravated criminal sexual abuse, one of the offenses enumerated in section 115-7.3. The State moved to admit evidence of four prior acts of sexual misconduct that defendant allegedly committed. The State sought to introduce the evidence for several purposes, including to show defendant's propensity. The trial court allowed the State to present evidence of three of the proffered offenses and ruled that the jury would be allowed to consider that evidence for propensity (as well as other) purposes. The State ultimately presented evidence of two of the offenses and the jury was instructed that it could consider the evidence on the issues of defendant's intent, identity, and propensity.

¶ 46    The problem is that neither of the other offenses introduced by the State is an offense enumerated in section 115-7.3. In each instance, according to the testimony at trial, defendant fondled and exposed his penis in a public place in the presence of a child. These actions likely constituted the offenses of sexual exploitation of a child (see 720 ILCS 5/11-9.1(a) (West 2018) ("A person commits sexual exploitation of a child if in the presence *** of a child and with knowledge that a child *** would view his or her acts, that person: (1) engages in a sexual act [including masturbation]; or (2) exposes his or her sex organs *** for the purpose of sexual arousal

or gratification *** .")) and public indecency (see 720 ILCS 5/11-30(a)(2) (West 2018) ("Any person of the age of 17 years and upwards who performs any of the following acts in a public place commits a public indecency: *** [a] lewd exposure of the body done with intent to arouse or to satisfy the sexual desire of the person.")). But neither of those offenses is enumerated in section 115-7.3. Evidence that defendant engaged in the offenses was thus not admissible for propensity purposes under section 115-7.3. The State does not argue otherwise on appeal.

¶ 47    Yet none of defendant's multiple attorneys raised this meritorious argument in the trial court. Defendant's attorney at the pretrial hearing on the State's motion to admit the other-crimes evidence conceded that "the statute allow[ed]" the evidence to be admitted and merely asked the court to limit the number of other offenses the State could present to avoid undue prejudice to defendant. The State asserts that this concession was the product of a reasonable (albeit mistaken) interpretation of the law. But the language of section 115-7.3 is unambiguous, and counsel appears to have simply overlooked or misunderstood it.

¶ 48    The State also argues that counsel made a reasonable strategic decision to focus on limiting the number of other offenses the State could present (for any purpose) rather than arguing that the other-crimes evidence was categorically inadmissible for propensity purposes. But counsel was not faced with an either-or choice. In light of the argument's obvious merit, and the lack of any downside to raising it, counsel's failure to argue that the evidence was categorically inadmissible for propensity purposes was objectively unreasonable. See *People v. Bloxton*, 2020 IL App (1st) 181216, ¶ 27 ("Counsel's failure to raise the strongest basis for quashing the arrest and suppressing the evidence does not qualify as objectively reasonable.").

¶ 49 Defendant's subsequent attorneys were similarly deficient in their handling of the other-crimes evidence. Just before the start of trial, when the court considered the purposes for which the other-crimes evidence would be admitted, defendant's new attorney noted defendant's earlier objection to the evidence but did not supplement it with the additional argument that the evidence could not be considered for propensity purposes under section 115-7.3. To the contrary, counsel conceded that, if the evidence were admitted, "obviously propensity" would be a proper purpose. The attorney who filed defendant's posttrial motion likewise failed to argue that section 115-7.3 did not permit the other-crimes evidence to be admitted for propensity purposes. Instead, that attorney argued only that the court erred in allowing the evidence because its probative value was outweighed by the danger of unfair prejudice.

¶ 50 The State argues that the attorney who represented defendant at trial effectively addressed the other-crimes evidence by cross-examining the witnesses who testified about the prior conduct, objecting (unsuccessfully) when the State argued in closing that the other-crimes evidence corroborated M.Q.'s allegations by demonstrating defendant's propensity to engage in such conduct, and cautioning the jury in the defense closing argument not to give too much weight to the other-crimes evidence. But, again, these were not either-or options for counsel. Cross-examining the other-crimes witnesses and addressing the implications of their testimony as propensity evidence during closing argument were not adequate substitutes for making a clearly meritorious argument that would have prevented the jury from being instructed that it could consider the other-crimes evidence for propensity purposes. The collective failure of defendant's trial attorneys to argue that the other-crimes evidence offered by the State did not meet section

115-7.3's requirements for admission as propensity evidence fell below an objective standard of reasonableness and amounted to constitutionally deficient performance.

¶ 51    However, a defendant is entitled to a new trial based on deficient representation only if there is a reasonable probability that, absent counsel's errors, the result of the trial would have been different. *Strickland*, 466 U.S. at 694. Defendant is unable to make that showing here. To start, it is important to note that, even when other-crimes evidence is inadmissible for propensity purposes, it may be admitted for other relevant purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); see *People v. Wilson*, 214 Ill. 2d 127, 135 (2005) ("evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crimes"). Here, defendant does not contest that the other-crimes evidence was properly admitted to establish his intent and identity. The question, then, is whether there is a reasonable probability that defendant would not have been convicted if the jury had been instructed that the other-crimes evidence could only be considered on the issues of defendant's intent and identity, and not for the additional purpose of demonstrating his propensity. In light of the strong evidence of defendant's guilt, we conclude that no such reasonable probability exists.

¶ 52    Although M.Q. and defendant were the only witnesses to their encounter at the Salvation Army store, both made statements incriminating defendant. At trial, M.Q. testified that defendant approached him and grabbed his hand. According to M.Q.'s trial testimony, defendant then pulled down his pants and forced M.Q. to touch his penis (or "front private part"), which M.Q. described as hard and hairy. Although M.Q. acknowledged that it was difficult for him to remember more than "a little part" of what was then a four-year-old event, and that others involved in the case had

reminded him of his prior statements before he testified, he never wavered in his description of defendant's actions.

¶ 53    In addition, M.Q. made similar statements to his grandmother and Almanza immediately after the incident, and in a forensic interview the following day, that the State introduced at trial as substantive evidence under section 115-10. M.Q.'s grandmother testified that M.Q. came to her in the store looking scared and told her that defendant had said he would not let him pass unless M.Q. touched him. M.Q. told his grandmother that defendant then grabbed his hand and made him touch his "huevos." Almanza testified that M.Q. told her a similar story: that defendant pushed him toward some clothing racks, said he would not let him pass unless he touched his "huevos," and then made him touch his "huevos." And in the forensic interview, M.Q. stated that a man in the store grabbed his hand, told him he was "not letting [him] pass," and then took off his pants and made him touch his "huevos."

¶ 54    Defendant discounts the value of M.Q.'s out-of-court statements because M.Q. reported that defendant made him touch his "huevos"—a slang term for testicles—whereas at trial M.Q. testified that defendant made him touch his penis. But M.Q.'s mother testified that, as a six-year-old, M.Q. used the word "huevos" to mean penis. It is not surprising that a young child would employ such terminology imprecisely. We do not see how the discrepancy casts any doubt on the reliability of M.Q.'s trial testimony or undermines the value of his out-of-court statements as evidence of defendant's guilt.

¶ 55    Defendant's stronger contention is that M.Q. made several confusing and seemingly false statements during the forensic interview, including that his hand was bleeding in the store, that he touched a needle at some point, and that the man did something with a knife and scissors. He also

described falling to the floor during the incident and reported that the man touched his nose and mouth, hit his leg, and made him touch the man's buttocks, even though he did not describe such actions at trial or in his other out-of-court statements. In addition, M.Q. had difficulty answering the interviewer's questions about the difference between truth and falsity. However, while these aspects of M.Q.'s forensic interview are concerning, defendant overstates their significance to the prejudice inquiry.

¶ 56     In particular, defendant largely ignores the import of his own incriminating statements, and the critical non-propensity purpose for which the jury could properly consider the other-crimes evidence, when assessing the strength of the State's case. Although defendant denied making the statements at trial, the jury heard evidence that defendant admitted that a boy approached him at the Salvation Army store and touched his penis, and that he tried to minimize his responsibility by claiming that the boy had initiated the contact. And, of course, the jury also heard evidence that, just two months before the incident at the Salvation Army store, defendant fondled and exposed his penis in front of two children while at other retail establishments. Although it was inadmissible for propensity purposes, the other-crimes evidence was relevant and admissible for the purpose of demonstrating defendant's intent and rebutting his contention that he did not intentionally make contact between his penis and M.Q.'s hand.

¶ 57     We recognize that the State relied on the improper propensity inference from the other-crimes evidence in its closing argument. However, based on the strong evidence of defendant's guilt without the propensity argument, and the admissibility of the other-crimes evidence for a non-propensity purpose, we conclude that there is no reasonable probability that the result of defendant's trial would have been different had the jury not been instructed that it could consider

the other-crimes evidence for propensity purposes. Accordingly, defendant has not demonstrated prejudice from his trial attorneys' failure to argue that the other-crimes evidence was inadmissible for propensity purposes under section 115-7.3.

¶ 58                                  III. CONCLUSION

¶ 59     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 60     Affirmed.