2026 IL App (1st) 232233-U
No. 1-23-2233

SIXTH DIVISION
March 31, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| VIVIAN ROMEO, on behalf of herself and as Special Administrator of the Estate of Harith Augustus, Deceased, | ) ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiff-Appellant, | ) ) | No. 18 L 12534 |
| v. | ) ) | |
| CITY OF CHICAGO and DILLAN HALLEY, | ) ) | The Honorable Bridget J. Hughes, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justice Hyman concurred in the judgment.
Justice Gamrath dissented.

**ORDER**

¶ 1    *Held:* We reverse the trial court's judgment where (1) the court erred in denying plaintiff's *Batson* challenge with respect to two venirepersons where the defendants' reasons for striking them were pretextual, and (2) the court erred in granting summary judgment regarding civil conspiracy where the police officers lacked reasonable, articulable suspicion that the victim was committing a crime to justify an investigatory stop.

¶ 2    Plaintiff Vivian Romeo appeals from the jury's verdict finding in favor of defendants the City of Chicago (Chicago) and Chicago police officer Dillan Halley for torts related to Halley's shooting of Harith Augustus. On appeal, plaintiff contends that the trial court erred by (1) denying

plaintiff's challenge to defendants' preemptory strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986), and (2) denying plaintiff's motion *in limine* to bar the introduction of evidence that Augustus did not have a valid concealed carry license (CCL) at the time of the shooting. Plaintiff also argues that the court erred in granting summary judgment regarding plaintiff's claim that other police officers and Halley conspired to unlawfully detain Augustus, and regarding the *respondeat superior* and indemnification grounds related to the conspiracy claim. For the following reasons, we reverse.

¶ 3                                            I. BACKGROUND

¶ 4         This matter arises from an incident on July 14, 2018, wherein Halley shot and killed Augustus during an investigative stop related to the officer's observation of a concealed firearm on Augustus' person.

¶ 5         On November 19, 2018, plaintiff filed a 10-count complaint in the circuit court of Cook County alleging that Halley used "excessive and inappropriate" deadly force when he shot Augustus without lawful justification. Plaintiff's complaint also named the other Chicago police officers involved in the incident: Megan Fleming, James Aimers, Leon Coleman, and Quincy Jones; Eddie Johnson, the former Superintendent of the Chicago Police Department, was also named. This complaint alleged, *inter alia*, a variety of torts, including wrongful death, assault, battery, and an action under the Illinois Survival Act on behalf of Augustus. The complaint also asserted constitutional violations related to the allegedly illegal search and seizure of Augustus, and alleged that the officers acted with willful and wanton conduct.

¶ 6         After a series of motions to dismiss, plaintiff filed her fourth amended complaint, the final operative complaint, on October 2, 2020. This complaint removed Johnson as a defendant and added Chicago police officer Danny Tan. Plaintiff alleged four torts against the individual

defendants: (count I) battery against Halley (both wrongful death and survival action), (count II) civil conspiracy against all individual defendants (survival action), and (counts III-IV) intentional infliction of emotional distress against individual defendants as a survival action and causing distress to plaintiff. Plaintiff also alleged that Chicago was liable under the theory of *respondeat superior*, and responsible for indemnification of compensatory damages.

¶ 7        On November 23, 2020, defendants answered the complaint and asserted numerous affirmative defenses including justification for the shooting as Halley allegedly "reasonably believed that *** Augustus was going to cause imminent death or great bodily harm" to him.

¶ 8                              A. Motion for Summary Judgment

¶ 9        Defendants filed a motion for summary judgment on April 15, 2022, arguing in relevant part that plaintiff's civil conspiracy count was legally insufficient because no facts in the record established that the officers agreed to act unlawfully or committed acts in furtherance of such an agreement. They further contended that Halley was legally justified in shooting Augustus, Halley's conduct was immunized under the Illinois Tort Immunity Act because he did not act willfully and wantonly, and defendants were not liable for intentional infliction of emotional distress. Because defendants argued that summary judgment was proper as to the individual defendants, they contended that the court should dismiss the *respondeat superior* and indemnification derivative claims.

¶ 10        Defendants attached, *inter alia*, Halley's deposition wherein he testified that he was taught that when he observed a civilian with a holstered firearm, "upon request" that civilian "should" provide him with a copy of a Firearm Owners Identification (FOID) card or a CCL. However, he was not taught to ask a person whether or not he or she has a CCL just because he believed that person carried a firearm. People with CCLs are permitted to carry firearms that are "either fully

concealed or partially concealed." On July 14, 2018, Halley saw Augustus walking on the sidewalk with a "[v]ery large imprint of a firearm." Augustus was not acting suspiciously "from a behavior standpoint" otherwise. Halley made eye contact with Officers Tan and Fleming, who also saw the "bulge." They followed Augustus. Halley and Fleming both pointed at the firearm to alert Officers Coleman and Jones to its presence. Halley stated that he had "never seen such a large imprint on anyone in [his] life."

¶ 11        Defendants also attached the depositions of Officers Jones, Coleman, Fleming, Tan, and Aimers. Each officer described the beginning of the encounter and their decision to stop Augustus. According to Jones' deposition, he believed the officers had "probable cause" to stop Augustus because "his gun wasn't concealed," as he observed the firearm in its holster. Coleman testified that he was not paying attention to the other officers and their nonverbal cues, but he saw them walking toward Augustus. As Augustus walked his t-shirt "would go up and down" to expose a holster. Fleming testified that she saw Augustus "walking" and not acting suspiciously, but he had a holstered firearm under his shirt, so she "mouth[ed]" to Jones that Augustus had a weapon and pointed at it. Fleming saw "the entire imprint of the weapon" underneath Augustus' clothing. Tan testified that he understood that unless a firearm was clearly visible on a person he would not be able to conduct an investigatory stop even if he believed that the person was carrying a firearm. However, if the firearm was not concealed, such a fact would provide the basis for an investigatory stop. On the day in question, Tan noticed Augustus walking past him and saw his shirt lift up revealing the "handle of a gun and the holster." The view of the holster and firearm raised Tan's suspicions because they were "not concealed" but rather "slightly covered by a shirt." Tan's suspicions were further raised because Augustus did not stop when Jones asked him to do so. Aimers testified that he saw "an object sticking out of [Augustus'] right side that wasn't fully

covered," which he assumed to be a firearm; otherwise nothing about Augustus was suspicious. Aimers saw the other officers point to one another and point to Augustus' side where the "bulge was sticking out."

¶ 12     The court denied the motion in part and granted it in part on September 13, 2022. In relevant part, the court dismissed the following counts against all defendants: (count II) civil conspiracy (survival action) and (count IV) intentional infliction of emotional distress. All claims against Fleming, Aimers, Coleman, Jones, and Tan were also dismissed, as well as the counts for *respondeat superior* and indemnification against Chicago related to their vicarious liability. Further, defendants raised the Illinois Tort Immunity Act as an affirmative defense, which grants immunity to local government employees for the execution of laws unless the acts or omissions constitute willful and wanton conduct. The court found that the record was ambiguous as to whether Augustus reached for his gun when he "fled" such that count I alleging willful and wanton battery survived summary judgment.

¶ 13     Regarding the court's dismissal of the civil conspiracy charge, the court noted that the communication between the officers was "largely nonverbal" with Coleman not noticing the nonverbal cues but following the other officers. The court found that the communication among Tan, Fleming, Halley, and Jones was minimal, but even if it were the basis for an agreement among the officers, they had a valid reason to agree to stop and detain Augustus: to check whether he possessed a valid CCL. The court also found that Coleman and Aimers minimally communicated with the other officers, and merely attempted "to aid the other officers who were stopping and questioning an armed suspect."

¶ 14                                    B. Motions *in Limine*

¶ 15        On June 26, 2023, plaintiff filed a motion *in limine* to bar defendants from presenting evidence suggesting that Augustus did not have a valid CCL, because Halley and the other officers had no knowledge of whether Augustus had a CCL at the time of the incident, and such evidence would be "irrelevant, speculative, and inadmissible" under the Illinois Rules of Evidence. Plaintiff also argued that the evidence would confuse and distract the jury from the relevant trial issues. During the hearing, plaintiff asserted that she would argue that Augustus had a FOID card because he was showing it to the officers during the stop. However, the officers did not yet know whether plaintiff violated the law, and plaintiff would not "suggest that [Augustus] was on the up and up." Defendants contended that allowing evidence implying that Augustus was not committing a crime, without their ability to assert that he lacked a CCL, would "hid[e] half of the facts from the jury." The court denied plaintiff's motion and commented that necessarily some focus would be on Augustus' actions because "you can't help *** and wonder why he ran." The court found that if plaintiff wanted to admit certain facts favorable to Augustus, including his valid FOID card and lack of criminal background, then it was "fair" for defendants to bring out that Augustus did not have a CCL. The court commented that both parties could argue inferences as to why Augustus "ran" from the police. Upon plaintiff's request for a limiting instruction, the court commented that it would not need "to make that decision this minute."

¶ 16        Included in the submitted evidence was footage from Officer Halley's bodyworn camera. The footage does not contain sound until after Augustus was shot.

¶ 17        Defendants also filed a motion *in limine* seeking to bar argument that defendants' actions were racially motivated or any other comments as to race, because the issue had no relevance. Plaintiff argued that Augustus was a Black man and Halley was white, and to disregard that fact

would be to place "blinders" on the plaintiff and say that they could not "acknowledge the reality that exists tragically in our world today." The court granted the motion, commenting that no evidence established that race was an issue in the case, and the jury would be able to view the bodyworn camera footage showing the races of the parties to the incident.

¶ 18                                          C. Jury Selection

¶ 19         The matter proceeded to jury selection on June 28, 2023. The venire was divided into two panels for *voir dire*, and each side was permitted to question the panels. Defendants exercised five peremptory strikes, three of which were used against Black venirepersons: Raphael Owens, Pamela Jarrett, and Hope Green.

¶ 20         Separately, another Black venireperson, Randall McTeer, told plaintiff's counsel that he was close to people who had been arrested on the West Side of Chicago. In chambers, McTeer stated that he did not believe that he could be fair because he was "very anti-police." McTeer commented that he discussed the matter with Owens. He stated that "[f]rom our point of view, from a Black man's point of view, on the west side of Chicago, I came up. I'm very anti-police." In describing the conversation, McTeer stated that he and Owens were "Black guys from the West side" and "see a lot of the stuff [that] goes on about police officers shooting Black people." McTeer also stated that he was a juror in a criminal case involving police violence, and as a juror he fought with the other white jurors to award the man a small sum of money. The court thanked McTeer and excused him, telling him not to talk about the case to anyone else.

¶ 21         When Owens was questioned in private about his conversation with McTeer, he acknowledged that McTeer spoke with him. The court asked him if he could judge the case solely upon the facts and not anything else, including what he spoke of with McTeer because "every case

is different," Owens stated that he could. When the court asked him if anything McTeer said would prevent him from being a fair and impartial juror, McTeer stated "[n]o, not at all."

¶ 22    Jarrett stated that her son worked as a security guard and she had another relative who had been charged with drug trafficking, but she did not know whether a firearm was involved. Jarrett also had "[s]everal" close friends or family members who had been the victim of crimes, and two great nephews and a cousin who had been killed by "gun violence" within the past couple years. Although Jarrett had been "impact[ed]" by the events, she asserted that she would not "be thinking about it in the back of [her] mind" nor would it impact the way that she arrived at a verdict.

¶ 23    Green stated that her best friend was "retired secret service" and she had several cousins who were police officers. Plaintiff's counsel asked Green that given her relationship with people who work in law enforcement, whether she would "lean" toward a police officer's testimony over a non-police officer's. Green responded "[h]ard to answer that with fidelity." She expressed that she was unsure, but "like[d] to believe that [she] could." She commented that she liked to "listen to both perspectives," so could not say "which way [she] would lean one way or the other." When plaintiff's counsel pressed her for more specificity, the court stated that it "liked her answer." Green also stated that her brother committed suicide, but it did not involve weapons. Green became emotional and cried in answering questions about her brother's suicide. She again asserted that she would "[p]robably not" lean to one side in the case, until she heard the facts.

¶ 24    After the third Black juror, Green, was struck, plaintiff raised *Batson* and argued that a *prima facie* case of discrimination was apparent. The court asked the defense for race neutral reasons as to why it chose to use its peremptory strikes against Jarrett, Owens, and Green.

¶ 25    Defense counsel commented that they believed Jarrett could not be fair and impartial because she had family members who were killed by "gun violence" and the case was about

firearm violence. Regarding Owens, defense counsel was "very concerned" about the conversation he had with McTeer, which "sounded like" he and McTeer were commiserating "about the fact that they were Black individuals that lived on the west side and experience police misconduct all the time." Defense counsel was also concerned that Owens was "influenced" by McTeer's conversation. Finally, Green became "emotional" during jury selection and expressed doubts that she could be fair and impartial.

¶ 26      The court denied plaintiff's *Batson* motion. It stated that it was "cognizant" of plaintiff's request, but found that defense counsel provided race neutral reasons for all peremptory strikes against Black venirepersons. It did not believe that defense counsel struck them solely because of their race but because "they don't think they will be *** fair and impartial to the City of Chicago."

¶ 27                                D. Jury Trial

¶ 28      Plaintiff's counsel presented evidence that in the afternoon of July 14, 2018, Officers Halley, Fleming, Jones, Tan, and Coleman were patrolling a stretch of East 71st Street in Chicago by foot, and Officer Aimers was nearby in his police vehicle. The purpose of the foot patrol was for several "probationary police officers" to meet members of the community and "make the community feel a little safer." Three "experienced" officers worked with the three probationary police officers. Halley was a probationary police officer partnered with Fleming, who had three years' experience. Jones was the most experienced officer in the group. All officers were equipped with body-worn cameras.

¶ 29      At around 5:30 p.m., Augustus walked past the group of police officers, but no officer noticed him. A few minutes later, Augustus walked by the group again. The second time this happened, Halley, Fleming and Tan followed him. Halley saw the "large imprint of a firearm"

visible as a "bulge" under Augustus' t-shirt. Halley had his "suspicions" as to the legality of the firearm but was not sure.

¶ 30    Jones approached Augustus to check his FOID card and CCL. Augustus did not answer Jones verbally but reached into his back pocket for his wallet. This movement alarmed Jones. When Jones leaned forward and pointed at Augustus' right hip where the firearm was, Augustus stepped backward. This action also alarmed Jones because "usually when someone does that, they're trying to get a little distance." Augustus stepped forward and extended his wallet to Jones. After this happened, Fleming grabbed Augustus' arm and Augustus pulled away from her grip. Tan and Halley also attempted to grab Augustus at this time. None of the officers verbally warned Augustus that they were going to touch him. Augustus spun away from the officers and moved to the street, then placed his hand on his firearm and pulled upward. After seeing that, Halley fired at Augustus with a five-round burst, and all rounds hit him. Jones approached Augustus and removed Augustus' firearm from its holster. He did not recall whether he needed to maneuver the snap to remove the firearm. Augustus died from his injuries.

¶ 31    As noted, the footage from Halley's body worn camera was admitted into evidence and has been viewed by this court. The footage depicts the officers approaching Augustus on the sidewalk. Augustus is wearing a black t-shirt and jeans. As Jones speaks with Augustus, three officers surround Augustus. Augustus removes his wallet from his back pocket and holds it in his left hand, with his left arm extended forward. As he does so, Fleming attempts to grab Augustus' right arm, and Halley and Tan attempt to grab him at the same time. Augustus spins away from the officers, and moves into the street, where he is blocked by a marked police vehicle which moves forward. Augustus' firearm in a holster on his right side becomes visible on the footage as he moves away from the officers. While turning to face the officers as he moves into the street, Augustus appears

to move his right hand to his firearm and seemingly makes a pulling motion. Halley then fires five rounds at him. The length of the entire encounter from the initial stop to the fifth gunshot is 16 seconds.

¶ 32          A forensic pathologist reviewed the autopsy report and photographs and determined the gunshots were to Augustus' right forearm, front left side of his chest, left hip or buttock, left shoulder, and back of his head.[1] The forensic pathologist opined that Augustus was conscious prior to receiving the last shot to his head, which rendered him unconscious. The gunshot wounds were painful to Augustus, in particular the ones to his wrist and left chest.

¶ 33          Plaintiff's counsel also presented the testimony of Augustus' friends and family who described Augustus' role in the community, their relationships with him, and their feelings regarding his death.

¶ 34          Prior to closing arguments, plaintiff's counsel requested the ability to argue that, after he had been stopped, Augustus, a Black man, fled from three non-Black police officers because he was afraid of police brutality. The court denied plaintiff's request, noting that counsel could argue that Augustus "ran" because he was afraid, but to specify that Augustus was afraid that he would be "subject to brutality" would "go a little too far because there's no evidence that he believed that." The court also noted that counsel could argue that Augustus "ran" because he was afraid of being arrested. The court commented that it was aware of the racial element of the case, and noted that it also would not be "lost" on anyone in the jury. Additionally, the court commented that "everyone's own personal life experience always comes into their decision," and such life

---

[1] Prior to trial, the court granted defendants' motion *in limine* to bar reference to the cause of death being "homicide" or "murder." The medical examiner, thus, did not testify as to the cause or manner of death.

experience "makes you a better juror." However, injecting the issue into the case would be "inflammatory" and "unnecessary," and would ultimately not benefit the case.

¶ 35  The jury returned a verdict in favor of the defendants and against plaintiff on July 7, 2023.

¶ 36           E. Posttrial Motion

¶ 37  On July 26, 2023, the court entered an agreed order extending the filing date for plaintiff's posttrial motion to September 8, 2023. On Thursday, September 7, 2023, at 5:50 p.m., plaintiff's counsel emailed the court and defense counsel attaching an "unopposed motion to extend the deadline for [plaintiff] to file her post-trial motion by one day" along with a draft proposed order. The motion was also filed electronically five minutes after counsel emailed it to the court. On Friday, September 8, 2023, at 10:39 a.m., the court responded to the email asking plaintiff's counsel to confer with defense counsel regarding a new date for the hearing. At 3:15 p.m., plaintiff's counsel responded correcting the proposed order with a minor change to the date for plaintiff's reply brief and noted that the parties agreed to keep the original date for oral argument: October 26, 2023. The order was entered on Monday, September 11, 2023.

¶ 38  The record establishes that plaintiff's counsel began the process of filing the motion and attachments using the electronic filing system at approximately 7:30 p.m. on September 11, 2023. The following day, plaintiff's counsel received an email from the clerk of the circuit court that the filings had been rejected "because of a bad PDF." Plaintiff's counsel rescanned and refiled the motion and attachments at 12:01 p.m. on September 12, 2023.

¶ 39  Plaintiff's motion for a new trial argued, in relevant part, that the court erred in denying plaintiff's *Batson* motion where plaintiff established a *prima facie* case of discrimination, and defendants' reasons for striking the venirepersons were pretextual. Plaintiff further argued that the

court erred by (1) allowing the defendants to present evidence regarding Augustus' lack of a CCL and (2) denying plaintiff's request to argue "alternative reasons" for Augustus' flight.

¶ 40     The court denied defendant's motion on November 16, 2023. First, the court addressed its jurisdiction, finding that plaintiff timely filed her motion for a new trial. The court further found that it did not err in allowing defendants to present evidence that Augustus did not have a CCL, because plaintiff wished to present evidence that he had a FOID card, and fairness dictated that all the facts regarding Augustus' certifications and any inferences related to why he ran after the initial stop should have been presented. Additionally, plaintiff being allowed to argue inferences related to race would have been overly prejudicial. Nor was the jury deprived of any evidence establishing that white police officers grabbed Augustus and interacted with him in a certain way. The court also found that it did not err in denying plaintiff's *Batson* motion, commenting that defendants presented appropriate race neutral reasons for striking Jarrett, Owens, and Green. In arguing with respect to Green, defense counsel contended that she "had an emotional outburst," to which the court disagreed, characterizing it as "[s]he cried." In arguing that defense counsel's reasons for striking Jarrett, Owens, and Green were pretextual, plaintiff's counsel contended that it was "undisputed" that the case was "racially-charged," to which the court agreed.

¶ 41     On November 17, 2023, the court entered an order finding that plaintiff timely submitted her motion for a new trial on September 11, 2023, and good cause existed to enter a *nunc pro tunc* order finding that the motion was filed on September 11, 2023, notwithstanding technical issues with the court's electronic filing system.

¶ 42     Plaintiff filed a timely notice of appeal on November 28, 2023.

¶ 43                                  II. ANALYSIS

¶ 44     On appeal, plaintiff argues that the trial court erred in denying her *Batson* motion regarding venirepersons Jarrett, Owens, and Green where plaintiff established a *prima facie* showing of discrimination and defendants' proffered reasons for striking them were pretextual. Plaintiff also contends that the trial court erred in allowing defendants to present evidence related to Augustus' lack of a CCL and simultaneously barring plaintiff from arguing that Augustus fled from the police because, as a Black man, he feared that he would be harmed by them. Finally, plaintiff argues that the court erred in granting defendants' motion for summary judgment with regard to her civil conspiracy claim because the evidence established that defendants Halley, Jones, Fleming, and Tan agreed to detain Augustus due to their observation of a holstered firearm on his side. Plaintiff contends that the mere observation of a firearm does not provide reasonable articulable suspicion to conduct an investigatory stop.

¶ 45                              A. Subject Matter Jurisdiction

¶ 46     As an initial matter, defendants argue that we lack subject matter jurisdiction over this appeal, because plaintiff did not file a timely postjudment motion, and so the time to file an appeal from the underlying judgment was not tolled. Defendants argue that, by agreement, plaintiff's posttrial motion was due on September 8, 2023. They contend that while plaintiff timely moved to extend the time to file her motion, the court did not grant the motion to extend the deadline until September 11, 2023, the day after the expiration of the agreed deadline. Despite defendant's contentions, we find our jurisdiction was preserved in this case.

¶ 47     A notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed, or within 30 days after the entry of the order disposing of the last pending timely postjudment motion directed against that judgment. Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). Under section 2-1202(c) of the Code of Civil Procedure (Code), "[p]ost-trial

motions [in jury cases] must be filed within 30 days after the entry of judgment \*\*\* or within any further time the court may allow within the 30 days or any extensions thereof." 735 ILCS 5/2-1202(c) (West 2022). "[I]f a timely post-judgment motion is filed, the court's denial of that motion starts a 30-day clock in which the party must appeal the final judgment." *Royal Oak Condominium Association, Inc. v. Stevenson*, 2025 IL App (1st) 242317, ¶ 16. Where a trial court does not grant an extension of time to file a postjudgment motion within 30 days of the entry of the final judgment, it lacks jurisdiction to later grant a plaintiff additional time to file a postjudgment motion. *Lowenthal v. McDonald*, 367 Ill. App. 3d 919, 922 (2006). If the court does not grant the extension of time within the relevant 30-day period, it is also without jurisdiction to hear the merits of the motion. *Id.* Whether we have jurisdiction is a question of law that we review *de novo*. *O'Gara v. O'Gara*, 2022 IL App (1st) 210013, ¶ 29.

¶ 48    Here, the jury returned its verdict on July 7, 2023. On July 26, 2023, the court entered an agreed order extending the filing date for plaintiff's posttrial motion to September 8, 2023. Then, at 5:50 p.m. on September 7, 2023, plaintiff's counsel filed a second motion for an extension of time to file her postjudgment motion on September 11, 2023, and emailed the motion to court and defense counsel. On September 8, 2023, the court acknowledged the filing by email and asked the parties to confer regarding a new date for the hearing. This email was the equivalent of a court's oral ruling granting the extension. See 735 ILCS 5/2-1202(c) (West 2022) (a postjudgment motion must be filed within "any further time the court may *allow* within the 30 days or any extensions thereof." (emphasis added)). The Code does not require that the order granting the extension be filed with the clerk to become effective. Thus, the formal entry of this order on September 11, 2023, was ministerial. There is no dispute that all parties were on notice that the extension was

granted on the date of the court's email. We, thus, have jurisdiction to consider the merits of this appeal. See *Lowenthal*, 367 Ill. App. 3d at 922.

¶ 49                                          B. *Batson* Challenge

¶ 50        Plaintiff first contends that the court erred in denying her challenge to the defendants' peremptory strikes against Jarrett, Owens, and Green under *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). Plaintiff contends that defendants excluded these venirepersons solely because they were Black, and their proffered race-neutral reasons for striking them were pretextual. We agree with respect to venirepersons Owens and Green.

¶ 51        "[T]he Equal Protection Clause forbids [an attorney] to challenge potential jurors solely on account of their race or on the assumption that [B]lack jurors as a group will be unable impartially to consider" issues regarding Black litigants. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). *Batson*, which is applicable to both criminal and civil cases, requires that a party may not use peremptory challenges to "purposefully exclude members of the venire based on their race." *McDonnell v. McPartlin*, 192 Ill. 2d 505, 526 (2000). The "Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). *Batson*, therefore, established a three-step procedure to determine whether an attorney exercised his or her peremptory challenges due to race. *People v. Williams*, 209 Ill. 2d 227, 244 (2004).

¶ 52        First, the party making the claim must establish a *prima facie* case of purposeful discrimination. *McDonnell*, 192 Ill. 2d at 526. If a *prima facie* case is established, the burden then shifts to the other party "to articulate a race-neutral reason for striking the venirepersons in question." *Id*. The court must then determine whether the party making the *Batson* challenge has met the burden of establishing purposeful discrimination. *Id*. At the second step, the attorney wishing to apply a peremptory strike must "give clear and reasonably specific, legitimate, race-

neutral reasons" which are based upon "something other than the race of the juror." *People v. Morales*, 308 Ill. App. 3d 162, 168 (1999). "A legitimate reason is not a reason that makes sense, but rather is a reason that does not deny equal protection," and as such "need not be persuasive, or even plausible." *People v. Easley*, 192 Ill. 2d 307, 324 (2000). An attorney's explanation will be considered race-neutral unless a discriminatory intent is inherent in the explanation, and such discriminatory intent may be found inherent "where the proffer of a supposedly race-neutral explanation has a racial ingredient." (Internal quotation marks omitted.) *People v. Wright*, 2024 IL App (1st) 161404-B, ¶ 19.

¶ 53        Here, the court denied the motion after at the third step of the procedure. Notably, when a trial court rules on the question of purposeful discrimination "the preliminary issue of whether a *prima facie* showing has been made becomes moot." *McDonnell*, 192 Ill. 2d at 527. The court must also "determine whether the explanation demonstrates that the excluded venireperson exhibited a 'specific bias' related to the particular case" other than that his or her shared race with a party "may bias him or her in favor of that party." *Mack v. Anderson*, 371 Ill. App. 3d 36, 48 (2006). When a court rules on the ultimate issue regarding discriminatory intent, we must uphold the ruling unless it is clearly erroneous. *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 103. "[W]e may not reverse unless we are left with a definite and firm conviction that a mistake has been committed." *Id*.

¶ 54                                        1. Raphael Owens

¶ 55        We find the defendants' proffered reasons for striking Owens to be pretextual. Defendants' reason for striking Owens was due to McTeer's statements about a conversation they had during a break from jury selection which "sounded like" he and McTeer were commiserating "about the fact that they were Black individuals that lived on the west side and experience police misconduct

all the time." McTeer informed the court that he had discussed the case with Owens and stated that "[f]rom our point of view, from a Black man's point of view, on the west side of Chicago, I came up. I'm very anti-police." He also stated that he and Owens were "Black guys from the West side" and "see a lot of the stuff [that] goes on about police officers shooting Black people." When the jury asked Owens about the conversation, he acknowledged that McTeer spoke with him, but also affirmed that he could judge the case based upon the facts and not based upon his conversation with McTeer. When the court asked him if anything McTeer said would prevent him from being a fair and impartial juror, Owens stated "[n]o, not at all."

¶ 56    Owens was struck because McTeer, another Black man, conversed with him regarding their experiences as Black men who lived in Chicago. McTeer acknowledged that *he* was "anti-police" and therefore not an impartial juror due to his experiences, but Owens affirmed that he could be fair and impartial. Neither defendants nor the court had concerns regarding Owens' demeanor but rather made assumptions regarding his partiality because of McTeer's statements. Rather than question him regarding the content of the conversation or his own attitude toward police officers, defendants chose to exercise a peremptory challenge solely due to McTeer's representations. See *Miller-El v. Dretke*, 545 U.S. 231, 246 (2005) (citing *Ex parte Travis*, 776 So. 2d 874, 881 (Ala. 2000)) ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.").

¶ 57    The dissent contends that the trial court's decision does not constitute clear error as defendants' explanation for striking Owens was race-neutral: his conversations with McTeer, who was openly belligerent and anti-police. The dissent contends that due to Owens' interactions with McTeer and possible influence by him, defendants did not act with discriminatory purpose in

striking Owens. As the trial court acknowledged, however, this case presents a scenario which was implicitly "racially-charged." McTeer clearly acknowledged that *he* could not be impartial due his experiences with police and asserted that he shared those experiences with Owens. However, defendants did not question Owens whatsoever regarding his own experiences, whether he agreed with McTeer, or even his perspective regarding the content of their conversation. Black men living in the West or South Sides of Chicago will have unique perspectives on life in those neighborhoods which differ from those of other individuals. Such perspectives should be welcome on a jury, especially for a case like this one. Had defendants been concerned about McTeer's influence or Owens' alignment with his views, they should have questioned Owens more thoroughly regarding the issue, rather than assuming that he agreed with McTeer or was otherwise tainted by him. See *id.*

¶ 58      At its core, Owens was struck because of his status as a Black man who lived in Chicago, and defendants' assumption that he shared the views of McTeer due to their race. This is impermissible. See *McDonnell*, 192 Ill. 2d at 526; see also *Batson*, 476 U.S. at 89 ("[T]he Equal Protection Clause forbids [an attorney] to challenge potential jurors solely on *** the assumption that [B]lack jurors as a group will be unable impartially to consider" issues regarding Black litigants). It was clearly erroneous for the court to deny plaintiff's *Batson* challenge regarding defendants' use of a peremptory strike against Owens. See *Crawford*, 2013 IL App (1st) 100310, ¶ 103.

¶ 59                                    2. Hope Green

¶ 60      We also find the defendants' proffered reasons for striking Green to be pretextual. Defendants purportedly struck Green because she became emotional when recounting the suicide of her brother and that she allegedly expressed doubts regarding her impartiality. Later in the

proceedings, the court corrected defendants when they described her "outburst" in court and noted that she simply "cried" when discussing her brother's death. Although Green commented that the suicide of her brother did not involve weapons, defendants were concerned that her expression of grief when recounting his death implied sympathy with plaintiff, a grieving mother.

¶ 61    In striking her due to her grief regarding her brother's suicide under unrelated circumstances and her alleged expressions of impartiality, defendants essentially raised concerns regarding Green's demeanor, even describing her expression of emotion while questioned about her brother's death as an "outburst." We must closely scrutinize "explanations which focus upon a venireperson's body language or demeanor *** because they are subjective and can be easily used *** as a pretext for excluding persons on the basis of race." *People v. Harris*, 129 Ill. 2d 123, 176 (1989). Green's grief regarding her brother's suicide was unrelated to the facts of the case, which center on the shooting of Augustus, plaintiff's son, by police officers. Nor did defendants inquire as to Green's ability to be impartial due to her feelings about her brother's suicide, which raises further doubts as to the plausibility of the concern. See *Miller-El v. Dretke*, 545 U.S. at 246.

¶ 62    Defendants' other basis for striking Green provides further evidence that their reasons for doing so were pretextual. Green stated that she had several close ties to law enforcement, including her best friend who was "retired secret service." Plaintiff's counsel then questioned her regarding whether she would be impartial *toward* a police officer's testimony due to her relationships with law enforcement officers. Green expressed that she was unsure but liked to listen to both perspectives. The court commented that it "like[d] her answer." Every time plaintiff's counsel questioned her regarding her ability to be partial, Green expressed that she "probably" would not lean to one side or the other until she heard the facts of the case. If anything, Green's answers expressed a potential partiality *toward* defendants. As noted, defendants' counsel did not question

her regarding any bias due to her brother's suicide, and the court made no findings related to Green's purported equivocation. See *Davis*, 231 Ill. 2d at 368.

¶ 63    The dissent also contends that the trial court's decision regarding the peremptory strike of Green was not clearly erroneous because she cried during voir dire and expressed "hesitancy" as to whether she could be fair and impartial. However, as noted, Green's expression of grief over her brother's suicide was completely unrelated to the facts of the case. Additionally, Green's statements regarding her "hesitancy" over impartiality appear, in context, to be an attempt to be completely forthcoming regarding her consideration of the evidence. She stated that she liked to consider "both perspectives" and needed to see the facts of the case before determining whether she would lean to one side or the other. In sum, exactly how a juror should consider evidence.

¶ 64    Accordingly, the court's ruling regarding defendants' peremptory strike of Green was clearly erroneous. See *Crawford*, 2013 IL App (1st) 100310, ¶ 103.

¶ 65                                3. Pamela Jarrett

¶ 66    Finally, defendants' reason for striking Jarrett, that she had several relatives who had been killed due to firearm violence, was not pretextual as it was a legitimate race-neutral reason related to the facts of the case. See *Mack*, 371 Ill. App. 3d at 48.

¶ 67    However, defendants' use of peremptory challenges to exclude two Black venirepersons based on race is a violation of the equal protection clause of the federal and Illinois constitutions. See *Snyder*, 552 U.S. at 478 (The "Constitution forbids striking even a single prospective juror for a discriminatory purpose"). Thus, we reverse and remand the matter for a new trial due to defendants' use of peremptory strikes against Owens and Green.

¶ 68                    C. Admission of Evidence Related to Augustus' lack of a CCL

¶ 69        Plaintiff also argues that the court erred in denying her motion *in limine* to exclude evidence related to Augustus' lack of a CCL. Because we reverse on the *Batson* issue, we need not address whether the admission of evidence related to Augustus' lack of a CCL was erroneous.

¶ 70                                      D. Summary Judgment

¶ 71        Finally, plaintiff contends that the court erred in granting summary judgment with respect to her civil conspiracy count, dismissing defendants Jones, Fleming, and Tan from the litigation, and dismissing the *respondeat superior* and indemnification counts related to their vicarious liability. Plaintiff argues that a question of fact exists regarding whether the officers conspired to detain Augustus illegally.

¶ 72        Summary judgment is appropriate where the pleadings, depositions, admissions on file, and affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2022). "Although a plaintiff is not required to prove his case at the summary judgment stage, in order to survive a motion for summary judgment, the nonmoving party must present a factual basis that would arguably entitle the party to a judgment." *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). Summary judgment is "a drastic measure" and a court should only grant it where the movant's right to judgment "is clear and free from doubt." *Lindblad v. Nelson*, 2019 IL App (1st) 181205, ¶ 22. We review the trial court's decision to grant summary judgment *de novo*, and construe all evidence in the record strictly against the moving party and liberally in favor of the nonmoving party. *Seymour v. Collins*, 2015 IL 118432, ¶ 49.

¶ 73                                  1. Civil Conspiracy

¶ 74          "Civil conspiracy is defined as a combination of two or more persons for the purpose of

accomplishing, by some concerted action, either an unlawful purpose or an unlawful purpose by

unlawful means." *Tri-Plex Technical Services, Ltd. v. Jon-Don, LLC*, 2024 IL 129183, ¶ 40. The

"gist" of a conspiracy cause of action is not the agreement, but rather the tortious acts performed

in furtherance of the agreement. *Lewis v. Lead Industries Association*, 2020 IL 124107, ¶ 20. Thus,

to state a claim, a plaintiff must allege the existence of an agreement and a tortious act committed

in furtherance of that agreement. *Lindblad*, 2019 IL App (1st) 181205, ¶ 23.

¶ 75                                 2. Investigatory Stop

¶ 76          Here, the tortious act related to the legality of the officers' investigatory stop of Augustus.

Under *Terry v. Ohio*, a police officer may conduct a brief, investigatory stop where the officer

"reasonably believes that the person has committed, or is about to, commit a crime." *People v.*

*Timmsen*, 2016 IL 118181, ¶ 9. The officer must have a "reasonable, articulable suspicion" that

criminal activity is afoot, which is a less demanding standard than probable cause but "must

amount to more than an inchoate and unparticularized suspicion or hunch of criminal activity."

(Internal quotation marks omitted.) *Id*. The decision to conduct an investigatory stop is based upon

the totality of the circumstances as viewed from the perspective of a reasonable officer at the time

of the stop. *People v. Sanders*, 2013 IL App (1st) 102696, ¶ 14. "Determining whether a stop was

reasonable is a two-step process in which we decide (1) whether the stop was justified at its

inception and (2) whether the scope of the stop was proportional to the circumstances that justified

the interference in the first place." *In re D.L.*, 2017 IL App (1st) 171764, ¶ 18.

¶ 77          Seizures such as investigatory stops do not occur "simply because a law enforcement

officer approaches an individual and puts questions to that person if he or she is willing to listen."

*People v. Luedemann*, 222 Ill. 2d 530, 551 (2006). A seizure occurs where the officers' conduct would lead a reasonable person to believe that he or she was not free to terminate the encounter. *People v. Gherna*, 203 Ill. 2d 165, 178 (2003). An individual's flight following unjustified police action cannot be the basis of a lawful seizure. *People v. Moore*, 286 Ill. App. 3d 649, 654 (1997).

¶ 78                    3. Applicability of the Firearm Concealed Carry Act to Investigatory Stops

¶ 79        Undeniably, thousands of police officers perform their duties without violating the constitutional rights of individuals in the communities they police. This case, sadly, implicates the behavior of a small group of Chicago police officers. We are mindful of this fact as we consider the legality of investigatory stop.

¶ 80        The Firearm Concealed Carry Act (Act) provides that licensees are permitted to "carry a loaded or unloaded concealed firearm, fully concealed or partially concealed, on or about his or her person." 430 ILCS 66/10(c)(1) (West 2018). Under the Act, a "[c]oncealed firearm" is defined as "a loaded or unloaded handgun carried on or about a person completely or mostly concealed from view of the public or on or about a person within a vehicle." 430 ILCS 66/5 (West 2018).

¶ 81        Here, we agree with plaintiff that a question of fact exists as to whether the officers detained Augustus without reasonable articulable suspicion that he had committed or was about to commit a crime. First, the facts establish that Officers Halley, Jones, Fleming, and Tan silently communicated regarding their observation of a partially visible, or visible, firearm in a holster on Augustus' side. This silent communication included pointing and mouthing to one another regarding its presence. Clearly, this communication was sufficient to establish that they would perform an investigatory stop because as Jones approached Augustus to ask him for his CCL, the other officers surrounded Augustus, with Fleming grabbing his arm as he retrieved his wallet. See *Lenard v. Argento*, 699 F. 2d 874, 882-83 (7th Cir. 1983) (Internal quotation marks omitted.) ("To

demonstrate the existence of a conspiratorial agreement, it must simply be shown that there was a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.").

¶ 82    More importantly, the proceedings established a question of fact regarding the legality of the investigatory stop. Each officer testified in his or her deposition that they believed they had the right to conduct an *investigatory stop* in order to question Augustus regarding whether he had a CCL simply due to their observation of a firearm about his person. Each officer testified that the only criterion for stopping Augustus was their observation of the firearm underneath his clothes.

¶ 83    The dissent presupposes the legality of the investigatory stop because the officers testified that they observed a "visible" firearm on Augustus' person. It is true that an individual carrying a firearm which is not *concealed* violates the Act, thereby justifying an investigatory stop. See 430 ILCS 66/10(c)(1) (West 2018). However, the Act also provides that an individual with a CCL may carry a firearm which is "partially concealed" from view of the public. *Id.* The two officers who initiated the encounter, Halley and Fleming, both testified that they observed a "bulge" or "imprint" of a firearm on Augustus' person. Other officers testified that they observed part of the firearm itself. Viewing the facts in the light most favorable to plaintiff, as we must, a question of fact exists as to whether the firearm was insufficiently concealed to justify the stop.

¶ 84    Mere possession of a firearm is not sufficient to give rise to a reasonable suspicion that the possessor is illegally carrying that firearm to justify such an investigatory stop. *People v. Dorsey*, 2025 IL App (1st) 240933, ¶¶ 48-52 (collecting federal cases). As an aside, we note that a district court for the Northern District of Illinois entered a consent decree between the State of Illinois and the City of Chicago, which includes sections regarding use of force policies and impartial

policing.[2] In February 2024, a federal judge commented that the Chicago Police Department had been "too slow" to comply with the decree with respect to their use of force.

¶ 85    Under current Illinois law, the officers could have inquired as to Augustus' possession of a CCL in a consensual encounter or if they had "a valid, independent basis for an investigatory stop." See *id*. ¶ 50. It is undisputed that no such independent basis exists. This is not a situation where Augustus openly carried the firearm or committed any other suspicious behavior, including furtive movements, which would have justified the stop. See, *e.g.*, *United States v. Alexander*, 78 F. 4th 346 (7th Cir. 2023) (the defendant openly holding a firearm prior to concealing it in his front waistband provided reasonable suspicion that he was committing an offense). Additionally, Augustus was initially cooperative, and only moved to the street after the officers attempted to grab him. See *Gherna*, 203 Ill. 2d at 178. Although the officers characterize his conduct as "running" or "flight," the footage is not conclusive regarding whether he would have fled the scene had Halley not shot him. Regardless, defendant's actions in moving away from the officers are consistent with an attempt to terminate the encounter, a permissible action during a consensual encounter. See *id*.

¶ 86    Ultimately, it was impossible for the officers to know, at the time of the stop, whether Augustus possessed a CCL. Halley had his "suspicions" but did not testify to facts establishing reasonable articulable suspicion. Therefore, he had a "hunch." See *Timmsen*, 2016 IL 118181, ¶ 9. It is, additionally, undisputed through the officers' actions and testimonies that they all understood they would be performing an investigatory stop, not a consensual encounter, when they silently communicated regarding the firearm. Such an action violates the fourth amendment. See *Dorsey*, 2025 IL App (1st) 240933, ¶ 57.

---

[2] See *State of Illinois v. City of Chicago*, Case No. 17-cv-5250 (N. D. Ill. 2019).

¶ 87    At most, the officers' observations of the firearm created a question of fact as to whether it was "concealed" or "partially concealed." As noted, Halley and Fleming observed an imprint or "bulge" underneath Augustus' t-shirt, and Jones and Tan both testified that they observed part of the firearm when Augustus' t-shirt raised as he walked. Although the officers all testified that they did not believe the firearm was "concealed," their different observations raise a question of fact as to whether the firearm truly was not concealed. See *id*. ¶¶ 27-28 (a firearm was partially concealed inside a tote bag "about" the defendant's person where about 30-40 percent of it was visible within arm's reach of the defendant).

¶ 88    In sum, the court erred in granting summary judgment regarding plaintiff's civil conspiracy claim and dismissing Officers Fleming, Jones, and Tan from the litigation. The court, thus, also erred in granting summary judgment regarding the indemnification and *respondeat superior* counts related to their conduct.

¶ 89                    4. Additional Questions of Fact

¶ 90    As this order finds that a question of fact exists as to whether the other officers participated in a conspiracy to illegally detain Augustus, we also note that Halley was a probationary officer at the time of the shooting, under the more experienced officers' supervision. He was partnered with Fleming, who had three years' experience. Fleming, in particular, escalated the encounter when she grabbed Augustus' arm as he removed his wallet from his pocket. Halley then shot Augustus before Augustus drew his firearm. Arguably, a question of fact also exists regarding the other officers' actions or inactions in properly monitoring and training Halley.

¶ 91                        III. CONCLUSION

¶ 92    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand for a new trial.

¶ 93        Reversed and remanded.

¶ 94        JUSTICE GAMRATH, dissenting:

¶ 95        Respectfully, I dissent.

¶ 96                                *Batson* Challenge

¶ 97        Lawyers aim to select juries favorable to their clients but cannot do so for discriminatory reasons. Here, the City gave distinct, race-neutral explanations for its peremptory strikes against Owens and Green. The trial court, who watched the lawyers and venirepersons, listened to them, and questioned them, found that each explanation was "credible, legitimate, and genuine" and based on something other than race. Given the required deference to the trial court's credibility assessment, I would uphold its *Batson* decision, as it does not constitute clear error.

¶ 98        Owens engaged in discussions both inside and outside the courtroom with McTeer, who openly described himself as anti-police and was excused for cause. During their conversations, McTeer recounted his prior jury service in a case against the police and expressed his belief that Black men from the West Side "see a lot of the stuff [that] goes on about police officers shooting Black people." The trial court found McTeer "belligerent" and "dogmatic," to the point it feared he would taint the entire venire. Owens sat next to McTeer, listened to him, and heard his views about police misconduct and jury under-compensation of a plaintiff in the prior case.

¶ 99        Though Owens stated he could remain fair and impartial despite McTeer's rant, the City was concerned that exposure to McTeer's extraneous commentary might influence him in this case involving a police shooting. The City's concern did not become discriminatory just because both men are Black. The question is whether the City acted with discriminatory purpose. The trial court, after extensive questioning and direct observation, found it did not. We should not replace that

finding with speculation to assume the City struck Owens because of his race, particularly when the court found its explanation "credible, legitimate, and genuine."

¶ 100      As for Green, she became visibly emotional, cried during voir dire, and equivocated when asked whether she could be fair and impartial, saying more than once she "could try." Demeanor is a classic, well-recognized ground for a peremptory challenge, and the trial court's firsthand observations of Green are crucially important. The City's concern that Green's heightened emotional state and hesitancy would make her overly sympathetic to the plaintiff was legitimate and non-pretextual. The trial court credited this explanation, and nothing in the record renders the credibility finding clearly erroneous. The strike should be upheld.

¶ 101      Summary Judgment

¶ 102      I also dissent from the majority's conclusion that the trial court erred in granting summary judgment on the civil conspiracy count. To establish civil conspiracy, more than routine, coordinated police activity is required. There must be proof of an agreement to accomplish an unlawful objective or a lawful objective by unlawful means, plus an overt act in furtherance of that agreement.

¶ 103      It is uncontested that the officers collectively approached Augustus upon observing a visibly exposed firearm, thereby justifying a brief investigative stop. There is no evidence indicating that the officers had a predetermined plan to infringe on Augustus's rights. Instead, they were performing standard, limited, and lawful law enforcement duties aimed at ensuring compliance and public safety. Permitting a civil conspiracy claim to proceed under these circumstances inappropriately broadens the application of the doctrine, invites conspiracy litigation over routine investigatory stops, and discourages necessary coordination among law

enforcement, which is vital for both officer and public safety. I would affirm the summary judgment on the civil conspiracy claim.